FILED
09-16-2020
John Barrett
Clerk of Circuit Court
2020CV005484
Honorable Christopher R.
Foley-14
Branch 14

**STATE OF WISCONSIN**  **CIRCUIT COURT**  **MILWAUKEE COUNTY**

| | |
|---|---|
| JOEL ROESSGER,<br>1344 S. 120th St.<br>West Allis, WI 53214, | **SUMMONS** |
| and | Case No.: |
| DANIELLE STIMA<br>1118 S. 48th St. Lower<br>West Allis, WI 53214 | Classification Code: 30301 |
| and | |
| JANET RANFT<br>N 4976 County Road Ws<br>Iron Ridge, WI 53035 | **<u>Jury Trial Demanded</u>** |
| | Amount claimed is greater than the amount under Wis. Stat. § 799.01(1)(d). |

Plaintiffs,

v.

STATE COLLECTION SERVICE INC.
2509 S STOUGHTON RD
MADISON, WI 53716-3314,

Defendant.

---

THE STATE OF WISCONSIN, To each person named above as a Defendant:

You are hereby notified that the Plaintiff named above has filed a lawsuit or other legal action against you. The Complaint, which is attached, states the nature and basis of the legal action.

Within forty-five (45) days of receiving this Summons, you must respond with a written Answer, as that term is defined in Chapter 802 of the Wisconsin Statutes, to the Complaint. The Court may reject or disregard an Answer that does not follow the requirements of the Statutes.

1

The Answer must be sent or delivered to the Court, whose address is: Clerk of Courts, 901 North 9th Street, Milwaukee, Wisconsin 53223, and to Plaintiffs' attorney, whose address is Ademi & O'Reilly, LLP, 3620 East Layton Avenue, Cudahy, Wisconsin 53110. You may have an attorney help or represent you.

If you do not provide an answer within forty-five (45) days, the Court may grant Judgment against you for the award of money or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint.  A Judgment may be enforced as provided by law.  A Judgment awarding money may become a lien against any real estate you own now or in the future and may also be enforced by garnishment or seizure of property.

Dated:   September 16, 2020                    ADEMI LLP

By: *Electronically signed by John D. Blythin*
John D. Blythin (State Bar No. 1046105)
*Attorney for Plaintiff*

Mailing address:
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Phone No.: 414-482-8000

2

FILED
09-16-2020
John Barrett
Clerk of Circuit Court
2020CV005484
Honorable Christopher R.
Foley-14
Branch 14

STATE OF WISCONSIN          CIRCUIT COURT          MILWAUKEE COUNTY
                            CIVIL DIVISION

| | |
|---|---|
| JOEL ROESSGER,<br>1344 S. 120th St.<br>West Allis, WI 53214, | **CLASS ACTION COMPLAINT** |
| and | Case No.:_____<br>Classification Code: 30301 |
| DANIELLE STIMA<br>1118 S. 48th St. Lower<br>West Allis, WI 53214 | **<u>Jury Trial Demanded</u>** |
| and | Amount claimed is greater than the<br>amount under Wis. Stat. §<br>799.01(1)(d). |
| JANET RANFT<br>N 4976 County Road Ws<br>Iron Ridge, WI 53035 | |
| Plaintiffs, | Exhibit A |
| v. | |
| STATE COLLECTION SERVICE INC.<br>2509 S STOUGHTON RD<br>MADISON, WI 53716-3314, | |
| Defendant. | |

## <u>INTRODUCTION</u>

1.      This class action seeks redress for collection practices that violate the Fair Debt

Collection Practices Act, 15 U.S.C. § 1692 *et seq*. (the "FDCPA") and Wisconsin Consumer Act,

Ch. 421-427, Wis. Stats. (the "WCA").

## <u>JURISDICTION AND VENUE</u>

2.      The court has jurisdiction to grant the relief sought by Plaintiff pursuant to Wis.

Stat. § 801.05(3).  Defendant's activities were directed at Wisconsin residents in Wisconsin.  *Id*.

3.     Venue in Milwaukee County is proper in that Defendant directed its lending and collection efforts into Milwaukee County, Plaintiffs Roessger and Stima are residents of Milwaukee County, and Plaintiff Ranft consents to jurisdiction for this action in Milwaukee County. Wis. Stat. § 421.401. Defendant also does substantial business in Milwaukee County. Wis. Stat. § 801.50.

## PARTIES

4.     Plaintiff Joel Roessger is an individual who resides in Milwaukee County.

5.     Plaintiff Danielle Stima is an individual who resides in Milwaukee County.

6.     Plaintiff Janet Ranft is an individual who resides in the Dodge County.

7.     Each Plaintiff is a "consumer" as defined in the FDCPA, 15 U.S.C. § 1692a(3), in that Defendant sought to collect from Plaintiff a debt incurred for personal, family, or household purposes.

8.     Each Plaintiff is also a "customer" as defined in the WCA, Wis. Stat. § 421.301(17), in that the debt was incurred as a result of a consumer transaction.

9.     Defendant State Collection Service, Inc. ("SCS") is a corporation with its principal place of business located at 2509 S. Stoughton Rd., Madison, WI 53716.

10.    SCS is licensed as a "Collection Agency" under Wis. Stat. § 218.04 and Wis. Admin. Code Ch. DFI-BKG 74.

11.    SCS is engaged in the business of a collection agency, using the mails and telephone to collect consumer debts originally owed to others.

12.    SCS is engaged in the business of collecting debts owed to others and incurred for personal, family or household purposes. SCS is a debt collector as defined in 15 U.S.C. § 1692a and Wis. Stat § 427.103(3).

2

# FACTS

## *Facts Related to Plaintiff Roessger*

13.     On or around November 16, 2019, SCS mailed a debt collection letter to Plaintiff Roessger regarding an alleged debt owed to "ORTHOPEDIC ASSOCIATION OF WISCONSIN SC." A copy of this letter is attached to this complaint as Exhibit A.

14.     Upon information and belief, the alleged debts referenced in Exhibit A were incurred as the result of transactions for personal medical services with an agreement to defer payment. *See Tylke v. Advanced Pain Mgmt., S.C.*, Case No. 14cv5354 (Milwaukee Co. Cir. Ct., Dec. 11, 2014) ("Any time a merchant sends a bill for goods or services after a consumer transaction has taken place, there is an 'agreement to defer payment.'"); *see also, e.g., Kelly v. Montgomery Lynch & Assocs.*, 2008 U.S. Dist. LEXIS 30917, at * 9-10 (N.D. Ohio Apr. 15, 2008) ("The debt at issue in this case involves financial expenses incurred … in exchange for medical services …. Pursuant to this debt, the Plaintiff was offered the right to receive medical services and to defer payment on those financial obligations. This is a classic transaction out of which debts arise under the FDCPA.").

15.     Upon information and belief, Exhibit A is a form letter, generated by a computer, and with the information specific to Plaintiff Roessger inserted by the computer.

16.     Upon information and belief, Exhibit A is a form debt collection letter, used by SCS to attempt to collect alleged debts.

17.     Upon information and belief, Exhibit A is the first written communication SCS mailed to Plaintiff Roessger regarding these alleged debts.

18.    Exhibit A includes the following representation which largely reflects the statutory validation notice that the FDCPA, 15 U.S.C. § 1692g, requires debt collectors provide alleged debtors along with, or within five days of, the initial communication:

**\*\*IMPORTANT CONSUMER NOTICE\*\***
Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will: Obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

19.    Exhibit A also includes the following representations:

| Creditor | Client Acct # | Service Date | Account Balance |
|---|---|---|---|
| ORTHOPAEDIC ASSOCIATES OF WISCONSIN SC | ██2669 | 08/01/19 | $25.00 |
| ORTHOPAEDIC ASSOCIATES OF WISCONSIN SC | ██2669 | 08/05/19 | $25.00 |
| | | Total Amount Due: | $ 50.00 |

20.    Above the validation notice, Exhibit A additionally states:

The past due accounts below have been referred to this office for debt collection. You may pay the total amount due by cash, check, credit card, debit card or money order. If requested, this office will notify you if and when it intends to report this claim to a credit bureau, but in no event will that happen until after the 30 day validation period described below.

21.    The unsophisticated consumer would understand the statement that "If requested, this office will notify you if and when it intends to report this claim to a credit bureau, but in no event will that happen until the 30 day validation period described below" to mean that SCS would report their alleged debt to one or more Consumer Reporting Agencies ("CRAs") approximately 30 days after the consumer received the notice. *See Slogaski v. Amcol Systems, Inc.*, No. 18-c-1604, Dkt. No. 19 (Order Denying Motion to Dismiss) (E.D. Wis. July 12, 2019) Exhibit E.

22.    The unsophisticated consumer would understand the statement that SCS would report their alleged debt to CRAs after the expiration of the 30-day validation period to be a threat that the alleged debt would be included on their credit report if they did not pay or dispute it during the validation period.

4

23.     Billing for medical services, which involves several levels of billing based on numerous accounts, providers, and insurers, is extraordinarily complicated and confusing to consumers.  *E.g.,* Wisconsin Department of Financial Institutions, "Consumer Protection Fact Sheet – Medical Billing," https://datcp.wi.gov/Pages/Publications/MedicalBilling147.aspx) (accessed on July 31, 2018) ("Be prepared to receive separate bills for physician services such as anesthesiologist, radiologist or surgeon.  This means you may receive several billings from just one visit to the hospital or clinic.  The bill may even come from a billing department with a different name than your hospital or clinic.").

24.     As a result of billing disputes and delays in insurance coverage, medical debt collection items may appear on consumers' credit reports, and negatively impact consumers' creditworthiness.

25.     In light of the impact of improper medical debt collection items on consumers' creditworthiness, the office of the Attorney General of the State of New York opened an investigation into the appearance of medical debts on consumers' credit reports.

26.     On March 8, 2015, Experian Information Solutions, Inc., Equifax Information Services, LLC, and TransUnion LLC – the three major national Credit Reporting Agencies (collectively "CRAs") entered into a Settlement Agreement with the Attorney General of the State of New York Bureau of Consumer Frauds & Protection pursuant to an Investigation by the Attorney General of the State of New York. A copy of this Settlement Agreement is attached to this Complaint as Exhibit B.

27.     Section III.A.3.a of the Settlement Agreement, Exhibit B, provides:

To allow appropriate time for insurance remediation and clarity on what a consumer's individual payment obligation is for a medical account, the CRAs shall prevent the reporting and display of medical debt identified and furnished by Collection Furnishers when the date of the first delinquency is less than one

5

hundred and eighty (180) days prior to the date that the account is reported to the CRAs.

28.    The 180-day waiting period went into effect on September 15, 2017. *See e.g.,* Michelle Andrews "Credit Agencies to Ease Up on Medical Debt Reporting," National Public Radio,    https://www.npr.org/sections/health-shots/2017/07/11/536501809/credit-agencies-to-ease-up-on-medical-debt-reporting (published July 11, 2017) ("Starting September 15, the three major credit reporting agencies --- Experian, Equifax and TransUnion --- will set a 180-day waiting period before including medical debt on a consumer's credit report. The six-month period is intended to ensure there's enough time to resolve disputes with insurers and delays in payment.") (accessed November 9, 2018).

29.    The two "Service Date[s]" listed on Exhibit A are August 1, 2019 and August 5, 2019.

30.    Upon information and belief, if the dates of service associated with the alleged debts referenced by Exhibit A were August 1, 2019 and August 5, 2019, the first date of delinquency for both debts would not have been until sometime in early September of 2019.

31.    If Plaintiff Roessger's alleged debts first became delinquent around early September 2019, those debts would not have been eligible to appear on Plaintiff's credit report until early March 2020, several months after the date of the letter, Exhibit A.

32.    The statement "If requested, this office will notify you if and when it intends to report this claim to a credit bureau, but in no event will that happen until the 30 day validation period described below" is thus false, deceptive, and misleading.

33.    The above language has the effect of telling the consumer that the debt will be reported to credit bureaus several months before it actually could appear on the report.

6

34.    Consumers are concerned about their creditworthiness and frequently take steps to keep derogatory information out of their credit files with the credit bureaus.

35.    Consumers with debt, including medical debt, have limited resources and often cannot pay all of their debts in full immediately. Consumers who attempt to pay their debts often must enter into payment plans to pay some amounts of some of their debts over time while delaying payment on other debts until resources are available. Naturally, consumers factor into their decisions on repayment whether and how soon particular debts may adversely affect their creditworthiness, as measured by credit scores.

36.    Defendant's language misleads consumers into prioritizing the debts Defendant is collecting over other debts owed to collection agencies and creditors who are not making similar misrepresentations.

37.    The Seventh Circuit has held that:

Debt collectors are required to tailor boilerplate language to avoid ambiguity.  If they fail to do so, they run the risk of liability.  *See Lox v. CDA, Ltd.*, 689 F.3d 818, 825 (7th Cir. 2012) (holding that the dunning letter would violate §1692e even if it was 'a form letter'). If they fail to do so, they run the risk of liability.  *See id.* ('When language in a debt collection letter can reasonably be interpreted to imply that the debt collector will take action it has no intention or ability to undertake, the debt collector that fails to clarify that ambiguity does so at its peril.') (quoting *Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1063 (9th Cir. 2011)).

*Boucher v. Fin. Sys. of Green Bay*, 880 F.3d 362, 371 (7th Cir. 2018).

38.    Plaintiff Roessger was misled and confused by <u>Exhibit A</u>.

39.    The unsophisticated consumer would be misled and confused by <u>Exhibit A</u>.

### ***Facts Related to Plaintiff Stima***

40.    On or about September 23, 2019, State mailed a debt collection letter to Plaintiff Stima regarding various alleged debts. A copy of this letter is attached to this Complaint as <u>Exhibit C</u>.

7

41.    Upon information and belief, each of the alleged debts referenced in Exhibit E were incurred as the result of a transaction for personal medical services with an agreement to defer payment.

42.    Upon information and belief, Exhibit C is a form letters, generated by computer, and with the information specific to Plaintiff Stima inserted by computer.

43.    Upon information and belief, Exhibit C is a form debt collection letter used by SCS to attempt to collect alleged debts.

44.    Exhibit C includes the following representation:

> Your payment of $ 169.00 is due 09/30/19.

45.    Exhibit C also lists a "Total Amount Due" as $674.94.

46.    By specifying a payment due as well as a "Total Amount Due," Exhibit C is misleading as to the amount of the debt sought to collect. *See, e.g.*, *Voeks v. Patenaude & Felix, A.P.C.*, Case No. 18-cv-1393 (E.D. Wis. Sept. 30, 2019).

47.    Plaintiff Stima was misled and confused by Exhibit C.

48.    The unsophisticated consumer would be misled and confused by Exhibit C.

### ***Facts Related to Plaintiff Ranft***

49.    On or around October 13, 2019, SCS mailed a debt collection letter to Plaintiff Ranft regarding an alleged debt owed to "AURORA MED CTR OF WASHINGTON CTY INC." A copy of this letter is attached to this complaint as Exhibit D.

50.    Upon information and belief, the alleged debt referenced in Exhibit D was incurred as the result of a transaction for personal medical services with an agreement to defer payment.

8

51.     Upon information and belief, Exhibit D is a form letter, generated by a computer, and with the information specific to Plaintiff Ranft inserted by the computer.

52.     Upon information and belief, Exhibit D is a form debt collection letter, used by SCS to attempt to collect alleged debts.

53.     Upon information and belief, Exhibit D is the first written communication SCS mailed to Plaintiff Ranft regarding this alleged debt.

54.     Exhibit D includes the following representation which largely reflects the statutory validation notice that the FDCPA, 15 U.S.C. § 1692g, requires debt collectors provide alleged debtors along with, or within five days of, the initial communication:

**\*\*IMPORTANT CONSUMER NOTICE\*\***
Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will: Obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

55.     Exhibit D also includes the following representations:

| Creditor | Client Acct # | Service Date | Account Balance |
|---|---|---|---|
| AURORA MED CTR OF WASHINGTON CTY INC | ▮▮▮▮5467 | 05/26/19 | $90.00 |
| | | Total Amount Due: | $ 90.00 |

56.     Above the validation notice, Exhibit D additionally states:

The past due accounts below have been referred to this office for debt collection. You may pay the total amount due by cash, check, credit card, debit card or money order. If requested, this office will notify you if and when it intends to report this claim to a credit bureau, but in no event will that happen until after the 30 day validation period described below.

57.     The "Service Date" listed by Exhibit D is May 26, 2019.

58.     Upon information and belief, if the date of service associated with the alleged debt referenced by Exhibit D was May 26, 2019, the first date of delinquency for the debt would not have been until sometime in late June of 2019.

9

59. If Plaintiff Ranft's alleged debt first became delinquent around late June of 2019, that debt would not have been eligible to appear on Plaintiff's credit report until late December of 2019, over two months after the date of the letter, Exhibit D.

60. The statement "If requested, this office will notify you if and when it intends to report this claim to a credit bureau, but in no event will that happen until the 30 day validation period described below" is thus false, deceptive, and misleading.

61. Plaintiff Ranft was misled and confused by Exhibit D.

62. The unsophisticated consumer would be misled and confused by Exhibit D.

### *The FDCPA*

63. The FDCPA creates substantive rights for consumers; violations cause injury to consumers, and such injuries are concrete and particularized. *Derosia v. Credit Corp Solutions*, 2018 U.S. Dist. LEXIS 50016, at *12 (E.D. Wis. Mar. 27, 2018) ("'a plaintiff who receives misinformation form a debt collector has suffered the type of injury the FDCPA was intended to protect against' and 'satisfies the concrete injury in fact requirement of Article III.'") (quoting *Pogorzelski v. Patenaude & Felix APC*, 2017 U.S. Dist. LEXIS 89678, 2017 WL 2539782, at *3 (E.D. Wis. June 12, 2017)); *Spuhler v. State Collection Servs.*, No. 16-CV-1149, 2017 U.S. Dist. LEXIS 177631 (E.D. Wis. Oct. 26, 2017) ("As in Pogorzelski, the Spuhlers' allegations that the debt collection letters sent by State Collection contained false representations of the character, amount, or legal status of a debt in violation of their rights under the FDCPA sufficiently pleads a concrete injury-in-fact for purposes of standing."); *Lorang v. Ditech Fin. LLC*, 2017 U.S. Dist. LEXIS 169286, at *6 (W.D. Wis. Oct. 13, 2017) ("the weight of authority in this circuit is that a misrepresentation about a debt is a sufficient injury for standing because a primary purpose of the FDCPA is to protect consumers from receiving false and misleading information."); *Qualls v.*

10

*T-H Prof'l & Med. Collections, Ltd.*, 2017 U.S. Dist. LEXIS 113037, at *8 (C.D. Ill. July 20, 2017) ("Courts in this Circuit, both before and after *Spokeo*, have rejected similar challenges to standing in FDCPA cases.") (citing "*Hayes v. Convergent Healthcare Recoveries, Inc.*, 2016 U.S. Dist. LEXIS 139743 (C.D. Ill. 2016)); *Long v. Fenton & McGarvey Law Firm P.S.C.*, 223 F. Supp. 3d 773, 777 (S.D. Ind. Dec. 9, 2016) ("While courts have found that violations of other statutes ... do not create concrete injuries in fact, violations of the FDCPA are distinguishable from these other statutes and have been repeatedly found to establish concrete injuries."); *Bock v. Pressler & Pressler, LLP*, No. 11-7593, 2017 U.S. Dist. LEXIS 81058 *21 (D.N.J. May 25, 2017) ("through [s]ection 1692e of the FDCPA, Congress established 'an enforceable right to truthful information concerning' debt collection practices, a decision that 'was undoubtedly influenced by congressional awareness that the intentional provision of misinformation' related to such practices, 'contribute[s] to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy,"); *Quinn v. Specialized Loan Servicing, LLC*, No. 16 C 2021, 2016 U.S. Dist. LEXIS 107299 *8-13 (N.D. Ill. Aug. 11, 2016) (rejecting challenge to Plaintiff's standing based upon alleged FDCPA statutory violation); *Lane v. Bayview Loan Servicing, LLC*, No. 15 C 10446, 2016 U.S. Dist. LEXIS 89258 *9-10 (N.D. Ill. July 11, 2016) ("When a federal statute is violated, and especially when Congress has created a cause of action for its violation, by definition Congress has created a legally protected interest that it deems important enough for a lawsuit."); *see also Mogg v. Jacobs*, No. 15-CV-1142-JPG-DGW, 2016 U.S. Dist. LEXIS 33229, 2016 WL 1029396, at *5 (S.D. Ill. Mar. 15, 2016) ("Congress does have the power to enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute," (quoting *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014)). For this reason, and to

11

encourage consumers to bring FDCPA actions, Congress authorized an award of statutory damages for violations. 15 U.S.C. § 1692k(a).

64.    Moreover, Congress has explicitly described the FDCPA as regulating "abusive practices" in debt collection. 15 U.S.C. §§ 1692(a) – 1692(e). Any person who receives a debt collection letter containing a violation of the FDCPA is a victim of abusive practices. *See* 15 U.S.C. §§ 1692(e) ("It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses").

65.    Misrepresentations of the character, amount, or legal status of any debt and misrepresentations as to the proper party to pay, injure or risk injury to interests expressly protected by Congress in the FDCPA. *See Degroot v. Client Servs.*, 2020 U.S. Dist. LEXIS 6677 (E.D. Wis. Jan. 15, 2020) ("[A]n informational injury can be concrete when the plaintiff is entitled to receive and review substantive information."); *Oloko v. Receivable Recovery Servs.*, 2019 U.S. Dist. LEXIS 140164 (N.D. Ill. Aug. 19, 2019); *Encore Receivable Management, Inc.*, 18-cv-1484-WED, 2019 U.S. Dist. LEXIS 134377 (E.D. Wis. Aug. 9. 2019); *Richardson v. Diversified Consultants*, No. 17-cv-4047, 2019 U.S. Dist. LEXIS 118786 *10-11 (N.D. Ill. July 17, 2019) ("the receipt of a communication misrepresenting the character of the debt (here, the amount owed) is the kind of injury that Congress sought to prevent through the FDCPA. 'Such an injury falls squarely within the ambit of what Congress gave consumers in the FDCPA: 'a legally protected interest in certain information about debts,' with 'deprivation of information about one's debt (in a communication directed to the plaintiff consumer) a cognizable injury.'" (internal citations omitted); *see also Pierre v. Midland Credit Mgmt., Inc.*, 2017 WL 1427070, at

12

*4 (N.D. Ill. Apr. 21, 2017); *Saenz v. Buckeye Check Cashing of Illinois*, 2016 WL 5080747, at *1-2 (N.D. Ill. Sept. 20, 2016); *Bernal v. NRA Grp., LLC*, 318 F.R.D. 64, 72 (N.D. Ill. 2016) (holding that Plaintiff had standing to challenge misleading communication sent to him because the communication violated his "right to be free from such misleading communications"). Such misrepresentations may cause consumers to make incorrect decisions about their finances or make payments to incorrect parties.

66.     15 U.S.C. § 1692e generally prohibits "any false, deceptive, or misleading representation or means in connection with the collection of any debt."

67.     15 U.S.C. § 1692e(2)(a) specifically prohibits the "false representation of the character, amount, or legal status."

68.     15 U.S.C. § 1692e(5) specifically prohibits threatening "to take any action that cannot legally be taken or that is not intended to be taken."

69.     15 U.S.C. § 1692e(10) specifically prohibits the "use of any false representation or deceptive means to collect or attempt to collect any debt."

### ***The WCA***

70.     The Wisconsin Consumer Act ("WCA") was enacted to protect consumers against unfair, deceptive, and unconscionable business practices and to encourage development of fair and economically sound practices in consumer transactions. Wis. Stat. § 421.102(2).

71.     The Wisconsin Supreme Court has favorably cited authority finding that the WCA "goes further to protect consumer interests than any other such legislation in the country," and is "probably the most sweeping consumer credit legislation yet enacted in any state." *Kett* v. *Community Credit Plan, Inc.,* 228 Wis. 2d 1, 18 n.15, 596 N.W.2d 786 (1999) (citations omitted).

13

72.     To further these goals, the Act's protections must be "liberally construed and applied." Wis. Stat. § 421.102(1); *see also* § 425.301.

73.     "The basic purpose of the remedies set forth in Chapter 425, Stats., is to induce compliance with the WCA and thereby promote its underlying objectives." *First Wisconsin Nat'l Bank v. Nicolaou*, 113 Wis. 2d 524, 533, 335 N.W.2d 390 (1983). Thus, private actions under the WCA are designed to both benefit consumers whose rights have been violated and also competitors of the violators, whose competitive advantage should not be diminished because of their compliance with the law.

74.     To carry out this intent, the WCA provides Wisconsin consumers with an array of protections and legal remedies. The Act contains significant and sweeping restrictions on the activities of those attempting to collect debts. *See* Wis. Stats. § 427.104.

75.     The Act limits the amounts and types of additional fees that may be charged to consumers in conjunction with transactions. Wis. Stats. § 422.202(1). The Act also provides injured consumers with causes of action for class-wide statutory and actual damages and injunctive remedies against defendants on behalf of all customers who suffer similar injuries. *See* Wis. Stats. §§ 426.110(1); § 426.110(4)(e). Finally, "a customer may not waive or agree to forego rights or benefits under [the Act]." Wis. Stat. § 421.106(1).

76.     Consumers' WCA claims under Wis. Stat. § 427.104(1) are analyzed using the same methods as claims under the FDCPA. Indeed, the WCA itself requires that the court analyze the WCA "in accordance with the policies underlying a federal consumer credit protection act," including the FDCPA. Wis. Stat. § 421.102(1).

77.     Further, the Wisconsin Supreme Court has held that WCA claims relating to debt collection are to be analyzed under the "unsophisticated consumer" standard. *Brunton v. Nuvell*

14

*Credit Corp.*, 785 N.W.2d 302, 314-15. In *Brunton*, the Wisconsin Supreme Court explicitly adopted and followed the "unsophisticated consumer" standard, citing and discussing Gammon v. GC Servs. Ltd. P'ship, 27 F.3d 1254, 1257 (7th Cir. 1994). *Id.*

78.     Wis. Stat. § 427.104(1)(g) states that a debt collector may not: "Communicate with the customer … in such a manner as can reasonably be expected to threaten or harass the customer."

79.     Wis. Stat. § 427.104(1)(h) states that a debt collector may not: "Engage in other conduct which can reasonably be expected to threaten or harass the customer …."  Wis. Admin. Code § DFI-Bkg 74.16(9) defines such "other conduct" as "including conduct which violates the Federal Fair Debt Collection Practices Act."

80.     Wis. Stat. § 427.104(1)(j) states that a debt collector may not: "Claim, or attempt or threaten to enforce a right with knowledge or reason to know that the right does not exist."

81.     Wis. Stat. § 427.104(1)(L) states that a debt collector may not: "Threaten action against the customer unless like action is taken in regular course or is intended with respect to the particular debt."

82.     The Wisconsin Department of Financial Institutions, which is tasked with regulating licensed collection agencies, has found that "conduct which violates the Federal Fair Debt Collection Practices Act" can reasonably be expected to threaten or harass the customer. *See* Wis. Admin. Code DFI-Bkg 74.16(9) ("Oppressive and deceptive practices prohibited.").

## COUNT I – FDCPA

83.     Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

84.     Count I is brought on behalf of Plaintiffs Roessger and Ranft.

15

85.    By stating "If requested, this office will notify you if and when it intends to report this claim to a credit bureau, but in no event will that happen until the 30 day validation period described below," Exhibits A & D include representations which are false, deceptive, and misleading and falsely threaten to take action which SCS did not intend to take.

86.    Defendant violated 15 U.S.C. §§ 1692e, 1692e(2), 1692e(5), and 1692e(10).

## COUNT II – WCA

87.    Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

88.    Count II is brought on behalf of Plaintiffs Roessger and Ranft.

89.    By stating "If requested, this office will notify you if and when it intends to report this claim to a credit bureau, but in no event will that happen until the 30 day validation period described below," Exhibits A & D could reasonably be expected to threaten and harass Plaintiff, threaten action which Defendant did not intend to take, and claim a right with knowledge or reason to know such a right does not exist.

90.    Defendant violated Wis. Stat. §§ 427.104(1)(g), 427.104(1)(h), 427.104(1)(j), and 427.104(1)(L).

## COUNT III – FDCPA

91.    Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

92.    Count III is brought on behalf of Plaintiff Roessger.

93.    By failing to disclose that Plaintiff Roessgers' alleged debt was subject to the accrual of interest, Exhibit A includes representations which are false, deceptive, and misleading as to the character, amount, and legal status of Plaintiff's alleged debt.

16

94.     Defendant violated 15 U.S.C. §§ 1692e, 1692e(2)(a), 1692e(5), 1692e(10).

## COUNT IV – FDCPA

95.     Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

96.     Count IV is brought on behalf of Plaintiff Stima.

97.     By specifying a payment due as well as a "Total Amount Due," Exhibit C includes representations which are misleading as to the character, amount, legal status of Plaintiff Stima's alleged debt and demands an amount in excess of the amount SCS and/or the creditors were legally authorized to demand.

98.     Defendant violated 15 U.S.C. §§ 1692e, 1692e(2)(a), 1692e(5), 1692e(10).s

## COUNT V – WCA

99.     Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

100.     Count V is brought on behalf of Plaintiff Stima.

101.     By specifying a payment due as well as a "Total Amount Due," Exhibit C could reasonably be expected to threaten and harass Plaintiff Stima and claims a right to immediate payment of the full balance of Plaintiff's alleged debt with reason to know such a right does not exist.

102.     Defendant violated Wis. Stat. §§ 427.104(1)(g), 427.104(1)(h), and 427.104(1)(j).

## CLASS ALLEGATIONS

103.     Plaintiffs bring this action on behalf of two proposed classes.

104.     Class I consists of (a) all natural persons in the State of Wisconsin, (b) who were sent a collection letter in the form represented by Exhibit A and/or Exhibit D to the complaint in

17

this action, (c) seeking to collect a debt owed to a medical provider, (d) between September 16, 2019 and September 16, 2020, inclusive, (e) in which a "date of service" listed on the letter is less than 180 days prior to the date of the letter, (f) that was not returned by the postal service.

105.     Plaintiffs Roessger and Ranft are the proposed representative of Class I.

106.     Class II consists of (a) all natural persons in the State of Wisconsin, (b) who were sent a collection letter in the form represented by Exhibit C to the complaint in this action, (c) seeking to collect a debt owed to a medical provider, (d) between September 16, 2019 and September 16, 2020, inclusive, (e) that was not returned by the postal service.

107.     Plaintiff Stima is the proposed representative of Class II.

108.     Each class is so numerous that joinder is impracticable. Upon information and belief, there are more than 50 members of each class.

109.     There are questions of law and fact common to the class members, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether the Defendant complied with the FDCPA and WCA.

110.     Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

111.     Plaintiffs will fairly and adequately represent the interests of the class members. Plaintiffs have retained counsel experienced in consumer credit and debt collection abuse cases.

112.     A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible.

18

## JURY DEMAND

113.    Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment in favor of Plaintiffs and

the Class and against Defendant for:

(a)    actual damages;

(b)    statutory damages;

(c)    injunctive relief;

(d)    declaratory relief;

(e)    attorneys' fees, litigation expenses and costs of suit; and

(f)    such other or further relief as the Court deems proper.

Dated:  September 16, 2020

ADEMI LLP

By:    /s/ John D. Blythin
       John D. Blythin (SBN 1046105)
       Mark A. Eldridge (SBN 1089944)
       Jesse Fruchter (SBN 1097673)
       Ben J. Slatky (SBN 1106892)
       3620 East Layton Avenue
       Cudahy, WI 53110
       (414) 482-8000
       (414) 482-8001 (fax)
       jblythin@ademilaw.com
       meldridge@ademilaw.com
       jfruchter@ademilaw.com
       bslatky@ademilaw.com

19

FILED
09-16-2020
John Barrett
Clerk of Circuit Court
2020CV005484
Honorable Christopher R.
Foley-14
Branch 14

# EXHIBIT A

**state**
collection service, inc.

*State Collection Service, Inc. • 2509 S. Stoughton Rd. • Madison, WI 53716-1809*
*A Private Collection Agency*

Phone Number (608) 819-2891 or Toll Free (888) 538-5215
Hours: Mon. – Thurs. 7a – 9p ❖ Fri. 7a – 5p ❖ Sat. 8a – 12p

November 16, 2019

The past due accounts below have been referred to this office for debt collection. You may pay the total amount due by cash,
check, credit card, debit card or money order. If requested, this office will notify you if and when it intends to report this claim to
a credit bureau, but in no event will that happen until after the 30 day validation period described below.

| Creditor | Client Acct # | Service Date | Account Balance |
|---|---|---|---|
| ORTHOPAEDIC ASSOCIATES OF WISCONSIN SC | ▇▇669 | 08/01/19 | $25.00 |
| ORTHOPAEDIC ASSOCIATES OF WISCONSIN SC | ▇669 | 08/05/19 | $25.00 |
| | | Total Amount Due: | $ 50.00 |

**\*\*IMPORTANT CONSUMER NOTICE\*\***

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion
thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that
you dispute the validity of this debt or any portion thereof, this office will: Obtain verification of the debt or obtain a copy of a
judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after receiving
this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

When you provide a check as payment, you authorize us either to use information from your check to make a one-time
electronic fund transfer from your account or to process the payment as a check transaction.

If you would like to make a payment, we provide the following options:

  Text "PAY" to 474747 for mobile pay

  Pay online at www.statecollectionservice.com/paymybill

  To make an automated telephone payment, call (608) 441-5010 or toll free (877) 677-4862

  Cash, Check, Credit Card, Debit Card or Money Order

This communication is from a debt collector. This is an attempt to collect a debt. Any information obtained will be used for that
purpose.

This collection agency is licensed by the Division of Banking in the Wisconsin Department of Financial Institutions,
www.wdfi.org.

\*\*\*Detach Lower Portion and Return with Payment\*\*\*

1270NSTAT106415_407656750

PO Box 1280
Oaks PA 19456-1280
ADDRESS SERVICE REQUESTED

| IF PAYING BY CREDIT CARD, FILL OUT BELOW | |
|---|---|
| CIRCLE CARD USING FOR PAYMENT | |
| Card Number = 3 or 4 digit security code (on back of card) | AMOUNT |
| SIGNATURE | EXP. DATE |

November 16, 2019

S1
Joel Roessger
1344 S 120th St
West Allis WI 53214-2145

State Collection Service, Inc
PO Box 6250
Madison WI 53716-0250

Phone Number (608) 819-2891 or Toll Free (888) 538-5215

Account # 55873345

0055873345 00000005000 3

FILED
09-16-2020
John Barrett
Clerk of Circuit Court
2020CV005484
Honorable Christopher R. Foley-14
Branch 14

# Exhibit B

ATTORNEY GENERAL OF THE STATE OF NEW YORK
BUREAU OF CONSUMER FRAUDS & PROTECTION

---

In the Matter of the

**Investigation by Eric T. Schneiderman,**
**Attorney General of the State of New York, of**

Experian Information Solutions, Inc.;
Equifax Information Services, LLC; and
TransUnion LLC,

Respondents.

---

<strong>SETTLEMENT AGREEMENT</strong>

The Office of the Attorney General of the State of New York ("NYAG") conducted an investigation, pursuant to New York State Executive Law § 63(12), of the practices of the three national credit reporting agencies, Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion LLC ("TransUnion") (collectively, the "CRAs") concerning, among other things, (a) the accuracy of consumer credit information maintained by the CRAs; (b) the CRAs' practices regarding investigation of consumer disputes of alleged inaccuracies in credit reports; and (c) the reporting of medical debt.

The NYAG, Experian, Equifax, and TransUnion are collectively referred to herein as "the parties" to this Settlement Agreement ("Agreement").

<strong>NYAG's BACKGROUND STATEMENT</strong>

1.     In the U.S., there are three nationwide CRAs: Experian, Equifax, and TransUnion.

Page 1 of 41

The CRAs maintain consumer credit information on approximately 200 million consumers.[1]  The credit information is compiled by the CRAs via voluntary submissions from "data furnishers" ("furnishers") such as creditors and collection agencies.  There are about 30,000 data furnishers that provide the CRAs with consumer credit information.[2]  The CRAs maintain five types of consumer information: (1) identifying information such as name, address, social security number, and birthdate; (2) current and past credit account information, including information about mortgages, car loans, and credit cards; (3) public records such as bankruptcies, foreclosures, civil judgments, and tax liens; (4) collection accounts (*i.e.*, debts that have been turned over to a collection agency); and (5) inquiries (requests to access a consumer credit report).[3]  The CRAs then provide credit reports to creditors who use the reports to assess consumers' credit-worthiness.  Creditors use credit reports to generate numerical ratings, called "credit scores," that are used in determining whether to grant credit and in determining the interest rate or other terms of credit.  Other users of credit reports include, but are not limited to, insurance providers, employers, and landlords.

    2.      Creditors often review credit reports in making decisions regarding the extension of credit.  Credit reports can affect whether a consumer is able to borrow money for higher education or to make a purchase such as a home or car, or to obtain a credit card, and can affect the consumer's cost of borrowing.  In addition, credit reports can affect how much a consumer pays for insurance; whether a consumer can rent an apartment; and may be adversely used by

---

[1] Federal Trade Commission, Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003 ("FTC Report"), at 2 (Dec. 2012).
[2] *See id.*
[3] *See id.* at 3.

employers in the hiring context. Accordingly, errors in credit reports can negatively impact consumers.

3.     The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, requires each of the CRAs to provide consumers with a free copy of the consumer's credit report once every 12 months. This enables consumers to periodically review their credit report for errors. The three CRAs maintain a central website, www.AnnualCreditReport.com, and also each have a toll-free telephone number and a mailing address through which consumers can order their free annual report. According to a 2011 report by the Consumer Financial Protection Bureau ("CFPB"), each year approximately 15.9 million consumers obtain a free annual file disclosure through www.AnnualCreditReport.com.[4] Increased awareness of AnnualCreditReport.com and consumers' right to obtain free annual file disclosures may increase the ability of consumers to identify potential errors in their credit reports.

4.     Consumers who identify potential errors in their credit report may initiate a dispute with the CRAs. Consumers initiate disputes by submitting a request by mail, by telephone, or online via the CRAs' individual websites (or by first visiting www.AnnualCreditReport.com, requesting a free annual disclosure, and then being redirected to the CRAs' individual websites to initiate a dispute). Consumers who file disputes may submit documents such as court orders, letters from creditors, or other documents in support of their disputes.

---

[4] Consumer Financial Protection Bureau ("CFPB"), The Impact of Differences Between Consumer- and Creditor-Purchased Credit Scores: A Report to Congress, at 9 (July 19, 2011).

5.     In a 2012 study of credit report accuracy,[5] the Federal Trade Commission ("FTC") determined that 26% percent of study participants identified at least one potentially material error in their credit reports, and that 13% of study participants experienced a change in their credit score as a result of modifications to their credit report after a dispute.[6] These findings suggest that millions of consumers have potentially material errors on their credit reports. However, the FTC study found that only 2.2% of the credit reports reviewed had errors that when corrected resulted in a material change in credit score—*i.e.*, a "credit tier increase."[7]

6.     Credit report errors generally arise due to incomplete or incorrect information provided by furnishers or consumers; fraud and identity theft; and, in some cases, through the CRAs' processes of matching information provided by furnishers to an individual consumer's credit files.   For example, when consumers have similar names and share other identifying information such as an address, some or all of the credit information of one consumer can become "mixed" into the file of another consumer.   Consumers may not be aware that their credit information has become mixed with another person's credit information.

7.     The CRAs employ sophisticated algorithms for matching the data submitted by furnishers to the credit files of individual consumers.   The matching systems use various combinations of identifying information such as name, address, and social security number to match the credit data with an individual consumer's credit files.   In order to take into account

---

[5] The references in this Agreement to third-party reports, studies, and articles are intended to illustrate issues that currently surround the credit reporting industry; however, nothing contained herein shall be construed to constitute an admission by the CRAs with respect to the accuracy of such reports, studies, or articles.

[6] FTC Report, at *i*.

[7] FTC Report, at 47.   The CRAs point to a 2011 study by the Policy and Economic Research Council (and funded by CDIA, the CRAs' industry association), which found that approximately 0.5% of credit reports had errors that, when corrected, resulted in a credit tier increase.

minor errors and omissions made by consumers and data furnishers, the matching systems do not require exact matches for all of the various identifying items.  Thus, a CRA's matching system might, for example, match reported credit information to a particular consumer even where the reported social security number does not match all nine digits of the consumer's social security number, where several other identifying items are an exact match.  The flexibility in the CRAs' matching system can benefit consumers by ensuring that positive credit information is not omitted from a consumer's file based on minor omissions or errors by the consumer or creditor in recording the consumer's identifying information.  On the other hand, the flexibility in the matching system may, in certain circumstances, lead a CRA to erroneously assign the credit information of one person to another person's credit file, creating a "mixed file."

8.     The CRAs' practices related to compiling and distributing consumer credit information are governed under federal law by the FCRA, and by relevant state laws including the New York General Business Law ("GBL") Article 25, Section 380 *et seq*.  The FCRA and GBL Article 25 require the CRAs to maintain reasonable procedures to assure maximum possible accuracy of consumer credit information.  15 U.S.C. § 1681e; GBL § 380-j(e).  The FCRA and GBL Article 25 also establish that consumers may dispute information in their credit report.  15 U.S.C. § 1681i; *see also* GBL § 380-f.  When a dispute is made, the CRAs must conduct a reasonable reinvestigation of disputed information.  In conducting a reinvestigation of disputed information, CRAs are required to "review and consider all relevant information submitted by the consumer" with respect to such disputed information.  15 U.S.C. § 1681i(a)(4).  If, after a reinvestigation, the information is found to be inaccurate, incomplete or cannot be verified, the CRA must promptly delete or modify the information as appropriate.  15 U.S.C.

Page 5 of 41

§1681i(a)(5); GBL § 380-f(b).

9.     The CRAs' reinvestigation process for disputes concerning credit accounts generally entails submitting the dispute to the furnisher of the disputed information using a shared, computerized system called e-OSCAR, unless the CRA determines that the information provided by the consumer is sufficient to enable the CRA to update the consumer's file without submitting the dispute to the furnisher.  To varying degrees among the CRAs over time, in some instances certain documents submitted by consumers may not have been reviewed by a CRA employee with sufficient discretion to resolve the dispute.  In such cases, as well as cases in which a CRA employee reviews the supporting documents and determines that the information provided is insufficient to enable the CRA to update the consumer's file, the CRAs submit a "code" to the furnisher designating a general category that describes the dispute, sometimes accompanied by a narrative explaining the dispute, and any supporting documents provided by the consumer.  The furnisher then has an independent obligation to review the dispute, and the opportunity to review any files uniquely in the furnisher's possession relevant to the dispute, and to report its findings to the CRAs.

10.     The NYAG has received consumer complaints regarding errors in credit reports and consumers' difficulty in rectifying errors through the CRAs' dispute process, including addressing errors resulting from mixed files.

11.     In addition to concerns about credit report errors, the NYAG is concerned about the effect of medical debt on consumers' credit scores.  Medical debt, which refers to debt owed

Page 6 of 41

due to unpaid medical costs, comprises more than half of all collection items on credit reports.[8] Approximately 20% of credit reports have at least one medical collection debt.[9] Medical debt differs from other types of consumer debt, such as credit cards or auto loans, in several ways. First, medical debt may result from services that are involuntary, unplanned and unpredictable, and for which prices are rarely provided in advance.[10] In addition, some medical debt results from disputes or delays in insurance coverage of particular bills. As a result, medical debt collection items on credit reports may not be accurate reflections of consumers' creditworthiness.[11] In recognition of this, at least one leading credit score provider has changed its credit score model to de-emphasize the impact of medical debt in credit scores.[12] However, these changes affect only the most recent version of the credit scoring model, which has not yet been adopted by the majority of credit providers, and so it does not cover all consumers in credit-seeking transactions. Accordingly, many consumers continue to suffer a negative impact on their credit scores as a result of medical debt.

12. The CRAs fully cooperated in the NYAG's investigation and produced a substantial volume of documents and information to the NYAG. The NYAG and the CRAs also met on multiple occasions to discuss the concerns raised by the NYAG.

13. The CRAs deny any wrongdoing and have voluntarily agreed to undertake the

---

[8] CFPB, Consumer Credit Reports: A Study of Medical and Non-Medical Collections, at 4-5 (Dec. 2014).
[9] *Id*. at 5.
[10] Chi Chi Wu, Strong Medicine Needed: What the CFPB Should Do To Protect Consumers from Unfair Collection and Reporting of Medical Debt, National Consumer Law Center, at 2 (Sept. 2014).
[11] *See* CFPB, Data Point: Medical Debt and Credit Scores, at 5 (May 2014). *See also id.* at 4.
[12] CFPB, Consumer Credit Reports: A Study of Medical and Non-Medical Collections, at 52 (Dec. 2014).

prospective relief set forth in Sections III and IV of this Agreement.

## PROSPECTIVE RELIEF

WHEREAS, the NYAG is willing to accept the terms of this Agreement and to discontinue its investigation, and the balance of this Agreement contains the prospective relief agreed to by the parties; and

WHEREAS, the parties each believe the obligations imposed by this Agreement represent the most fair and most efficient method for resolving the matters raised in the NYAG's investigation;

IT IS HEREBY UNDERSTOOD AND AGREED, by and between the parties that:

## I.    **DEFINITIONS**

1.    For purposes of this Agreement, the CRAs and the NYAG adopt the definitions set forth in the FCRA, 15 U.S.C. § 1681a, as that provision shall be modified or amended in the future.  In addition, the following terms not defined in the FCRA but used herein shall have the following meanings for purposes of this Agreement.

a.    "ACDV" shall mean Automated Credit Dispute Verification, an automated dispute form that is initiated by a CRA on behalf of a consumer and routed to the appropriate furnisher for review and update or verification.

b.    "Affiliate" shall mean an entity that directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, any of the CRAs.

c.    "AUD" shall mean Automated Universal Data, an automated form used for out-of-cycle credit history updates that is initiated by the furnisher.

Page 8 of 41

d.     "Collection Furnishers" shall mean collection agencies or debt purchasers that furnish data to any of the CRAs.

e.     "Completion Date" shall mean three (3) years and ninety (90) days following the Effective Date.

f.     "Creditor Classification Codes" shall mean the list of Metro 2[13] codes that identify the type of business that the Original Creditor is engaged in (*e.g.*, retail, medical/health care, insurance, educational, banking, etc.).

g.     "e-OSCAR" shall mean the "Online Solution for Complete and Accurate Reporting," a browser-based system for conveying consumer disputes to furnishers and for furnishers to convey the results of their reinvestigations to the CRAs, designed in part in furtherance of compliance with the FCRA, 15 U.S.C. § 1681i(a)(5)(D).

h.     "Effective Date" shall mean the date on which this Agreement is signed and fully executed by all parties hereto.

i.     "Illegal Lender" shall mean any non-bank entity that is subject to section 340 of the New York Banking Law and that provides personal loans that are in violation of the requirements of:  (a) N.Y. General Obligations Law § 5-501; or (b) N.Y. Banking Law § 14-a.

j.     "Implementation Schedule" shall mean the timeframe for implementation

---

[13] "Metro 2" refers to one of two standard file formats used by furnishers to submit data to the CRAs.  The other standard file format is referred to as "Metro 1."  The Metro 1 format was first introduced in the mid-1970s.  The Metro 2 format was developed by the Consumer Data Industry Association ("CDIA") in 1997 to provide greater accuracy of consumer credit information by enabling furnishers to provide more data fields that make it "more likely that CRAs will match the reported item to the correct consumer's file."  Federal Trade Commission, Report to Congress on the Fair Credit Reporting Act Dispute Process, at 10 (Aug. 2006).  Although Metro 2 is the preferred format, many furnishers still utilize the Metro 1 format.

Page 9 of 41

of the substantive terms of this Agreement, as further set forth in Section II.

        k.    "National Credit Reporting Working Group" or "Working Group" shall mean a group of data experts from each CRA who will participate in regular meetings to identify and share best practices concerning issues related to data quality and data accuracy including, but not limited to, monitoring of furnishers and the dispute process, as discussed more fully in Section III.

        l.    "Original Creditor" shall mean the name of the original credit grantor as reflected in the K1 Segment in Metro 2 and shall be construed consistent with the Credit Reporting Resource Guide.

        m.    "Supporting Dispute Documentation" shall mean a document submitted by a consumer who has initiated a dispute, other than a document created by the consumer or the consumer's own statement of dispute, that has some objective indication that a party with direct involvement or authority regarding the disputed item of information in the consumer's file has played a role in creating the document.

    2.    All other terms defined elsewhere in this Agreement are so defined, and shall have such meanings as set forth where defined, for purposes of this Agreement, including the following terms: Confirmed Mixed File; Death Notice; Disputed Deceased Indicator; and Repeat Dispute.

## II.    <u>IMPLEMENTATION SCHEDULE</u>

The CRAs have provided the NYAG with an Implementation Schedule that sets forth the expected schedule for implementation of each of the substantive policies, practices, and procedures set forth in Section III. This Schedule is attached as Exhibit A hereto. To the extent

there are any differences between the descriptions of the substantive policies, practices, and procedures set forth in Section III of this Agreement and those set forth in the Implementation Schedule, the provisions of Section III of this Agreement shall control.

The Implementation Schedule sets forth three phases of implementation, including scheduled dates by which each phase will be completed, as follows:

1. **Phase 1**: The CRAs shall complete the tasks in Phase 1 within six (6) months of the Effective Date.

2. **Phase 2**: The CRAs shall complete the tasks in Phase 2 within eighteen (18) months of the Effective Date.

3. **Phase 3**: The CRAs shall complete the tasks in Phase 3 by the Completion Date.

Unless otherwise noted in the Implementation Schedule, the policies, practices, and procedures set forth in Section III shall all be implemented no later than the Completion Date.

## III.    AFFIRMATIVE OBLIGATIONS AND PROHIBITIONS

### A.    Data Accuracy and Quality

#### 1.    *Reporting of Collection Data*

a.    The CRAs shall continue to require Collection Furnishers to furnish the name of the Original Creditor and the Creditor Classification Code associated with each account or item reported. The CRAs shall revise training materials and adopt policies and procedures to notify and instruct Collection Furnishers that the name of the Original Creditor and the Creditor Classification Codes are mandatory reporting requirements, and the CRAs shall reject data that is not provided with this information.

b.    The CRAs shall implement a process designed to identify Collection Furnishers who misreport or misuse the Creditor Classification Codes on a recurring basis, such

as, for example, by using a default value. The CRAs shall take corrective action against Collection Furnishers identified pursuant to this provision, including, but not limited to, working with a Collection Furnisher to remediate the problem, suppressing certain of the Collection Furnisher's data, and refusing to accept certain information from the Collection Furnisher.

        c.      The CRAs shall prohibit Collection Furnishers from reporting debt that did not arise from any contract or agreement to pay (including, but not limited to, certain fines, tickets, and other assessments).

        d.      The CRAs shall implement a process designed to remove from the CRAs' respective credit reporting databases any existing data reported by Collection Furnishers relating to the collection of debt that did not arise from a contract or agreement to pay. Such efforts shall include, but are not limited to, sharing best practices for key words and screening procedures designed to identify debt that did not arise from any contract or agreement to pay.

        e.      The CRAs shall require Collection Furnishers to regularly reconcile data relating to accounts in collection that have not been paid in full. This regular reconciliation will be accomplished, in part, by periodic removal or suppression of all collection accounts that have not been updated by the Collection Furnisher within the last six months. In addition, the CRAs shall revise training materials and instruct new and existing Collection Furnishers on accurately reporting and deleting accounts that are sold, transferred, or no longer managed by the reporting entity.

      **2.**     ***Retire Metro 1 Reporting Format***

Not later than ninety (90) days following the Effective Date, the CRAs shall announce the full retirement of the Metro 1 data reporting format. Thereafter, at the end of a reasonable

Page 12 of 41

notice period specified in the Implementation Schedule that provides furnishers with sufficient time to undertake all steps necessary to migrate to the Metro 2 data reporting format, the CRAs shall no longer accept any data from furnishers utilizing the Metro 1 data reporting format. Commencing with the announcement of the retirement of the Metro 1 data reporting format, the CRAs shall use commercially reasonable efforts to assist furnishers in migrating to the Metro 2 data reporting format, with the intent that such migrations will be done on a rolling basis.

3. *Medical Debt Collections*

a. To allow appropriate time for insurance remediation and clarity on what a consumer's individual payment obligation is for a medical account, the CRAs shall prevent the reporting and display of medical debt identified and furnished by Collection Furnishers when the date of the first delinquency is less than one hundred and eighty (180) days prior to the date that the account is reported to the CRAs.

b. The CRAs shall instruct Collection Furnishers on the use of the Metro 2 special comment codes of "BP" for debt identified as "paid by insurance" and "AB" for debt identified as "being paid by insurance" and instruct Collection Furnishers to remove or suppress medical accounts reported as "paid by insurance" or "being paid by insurance" if such accounts were in fact paid in full by the consumer's insurance carrier and were not the obligation of the consumer.

c. The CRAs shall implement a process designed to remove or suppress known medical collections furnished by Collection Furnishers from files within the CRAs' respective credit reporting databases when such debt is reported either as having been paid in full by insurance or as being paid by insurance.

4.    *Authorized User Accounts*

a.    The CRAs shall prohibit furnishers from reporting authorized users without a date of birth (using month and year) on new accounts and reject data that does not comply with this requirement.

b.    The CRAs shall inform furnishers of the mandatory reporting requirement relating to additions of authorized users on newly opened accounts and to reject such data that is not provided with a date of birth (using month and year).

5.    *Illegal Lenders*

a.    As part of their onboarding policies and procedures when vetting new furnishers, the CRAs shall implement a process designed to identify furnisher applicants that operate as Illegal Lenders to New York residents and to reject such applicants.  Specifically, the NYAG will provide the CRAs with a list of Illegal Lenders after either (i) notifying Illegal Lenders and/or (ii) making the list of Illegal Lenders publicly available.  The NYAG may update the list of Illegal Lenders as necessary.  The NYAG shall include as much identifying information as possible regarding each Illegal Lender included in the List (such as corporate name, place of incorporation, and corporate address) to permit the CRAs to effectively identify each Illegal Lender.

b.    The CRAs shall implement a process designed to suppress from the CRAs' respective credit reporting databases any existing data for New York residents where the Original Creditor is an Illegal Lender that appears on the list referenced in paragraph 5(a).

6. ***Minimum Identification Elements on Trade and Collection Data***

To expand the CRAs' capabilities to match new credit data to the file of the appropriate consumer, the Working Group shall establish minimum standards that each CRA will adopt regarding the types of indicative information that furnishers of newly opened trade and collection data shall report to the CRAs in order for the CRAs to accept their data. In establishing these standards, the Working Group shall share and analyze data to help identify trends in furnisher reporting and/or consumer disputes that relate to the lack of a particular type of indicative information in order to determine key issues with particular groups of furnishers or reporting practices.

7. ***Accuracy of Public Record Data***

To expand the maximum possible accuracy of public record data, the Working Group shall establish standards that each CRA will adopt regarding the collection of public record data. In establishing these standards, the Working Group shall consider: (i) the particular practices of the ultimate data source (*e.g.*, the specific courthouse), including how the public record information is filed and its availability and accessibility; and (ii) whether information relating to the satisfaction of judgments and/or other updates are available on a reasonably timely basis from a given public record data source.

B. **The Dispute Process**

1. ***Initiating a Dispute***

a. Regardless of whether a dispute is initiated online, by phone, or by mail, the CRAs shall not refuse to accept the disputes solely because the consumer (a) has not recently received a credit report or file disclosure from the CRA, or (b) does not have or has not supplied

an identification number associated with a credit report or file disclosure from the CRA.

        b.     The CRAs shall eliminate any policies or practices that require a consumer to obtain, or that create the impression that a consumer must obtain, a current report or identification number before disputing the completeness or accuracy of information in his or her file.

      **2.**     ***Repeat Disputes***

Except for any dispute previously initiated by a consumer through the use of a credit repair firm, the CRAs shall not deny New York consumers the right to initiate one additional dispute solely on the grounds that the consumer previously initiated a dispute of the same item of credit information, where the previous dispute was filed during the three-year period prior to the Completion Date and the consumer submits Supporting Dispute Documentation with the new dispute (a "Repeat Dispute").  The obligations of this Section III.B.2 shall apply only with respect to one Repeat Dispute, and the CRAs shall have no obligations under this Section III.B.2 with respect to any additional Repeat Disputes.

      **3.**     ***Dispute Information Sharing Among CRAs***

The CRAs shall implement an automated process to share with each other the following dispute outcomes for certain consumer disputes processed outside of e-OSCAR.

        a.     <u>Deceased Indicators</u>

The CRAs shall implement an automated process to share relevant information about consumers who dispute as inaccurate a tradeline for which the furnisher reports a deceased indicator ("Disputed Deceased Indicator") and for which a CRA has investigated and determined to cease reporting such Disputed Deceased Indicator.  The CRAs shall develop and share best

practices for identifying and preventing inaccurate reporting of Disputed Deceased Indicators, which shall include, but are not limited to, the following actions:

      i.      Upon the receipt of any shared Disputed Deceased Indicator, the receiving CRAs shall:  investigate whether the Disputed Deceased Indicator is associated with the affected consumer in the CRA's credit database; take reasonable steps to avoid reporting any Disputed Deceased Indicator deemed inaccurate; and take other appropriate action to prevent the Disputed Deceased Indicator deemed inaccurate from reappearing on the affected consumer's credit report, including reporting the inaccurate Disputed Deceased Indicator to the furnisher.

      ii.      The CRAs shall revise training materials and instruct new and existing furnishers on Metro 2 reporting standards for reporting deceased indicators, such that furnishers:  consistently and accurately report deceased indicators only at the consumer level, and not at the account level; and verify documentation that confirms a consumer's death before reporting deceased indicators to the CRAs.

      iii.      The CRAs shall analyze the CRAs' shared data on Disputed Deceased Indicators to identify trends in consumer disputes with respect to deceased indicators and to determine whether other appropriate actions should be taken to further increase the maximum possible accuracy of tradelines reported as deceased.

      b.      <u>Death Notices</u>

The CRAs shall implement an automated process to share relevant information about consumers on whom a CRA has received appropriate proof of death, including, but not limited to, death certificates and letters testamentary (each a qualifying "Death Notice") from the consumer's executor, personal representative, or other authorized person representing the

consumer's estate.  The CRAs shall develop and share best practices for sharing Death Notices among the CRAs, which shall include, but are not limited to, the following actions:

i.     Upon receipt of any shared Death Notice, regardless of whether the CRAs received the Death Notice independently, the receiving CRAs shall update the credit file of the affected consumer as if the CRAs had received the Death Notice directly from the consumer's executor, personal representative, or other authorized person representing the consumer's estate.

ii.     As part of the consumer education enhancements in Section III.C.1, the CRAs shall update their respective websites and cooperate in the creation and approval of educational material to be included on AnnualCreditReport.com advising consumers and their executors, personal representatives, and other authorized persons representing their estates on what documents constitute a valid documentation of death and that Death Notices shall be shared among the CRAs.

iii.     The CRAs shall create a common statement to be included in their written communications to persons submitting Death Notices to inform them that the relevant information about consumers identified as deceased shall be shared among the CRAs.

    c.     <u>Mixed File Information</u>

The CRAs shall implement an automated process to share relevant information about consumers who dispute information contained in their credit reports when a CRA confirms that a consumer's credit file information was mixed with that of another identified consumer (hereafter referred to as a "Confirmed Mixed File").  The CRAs shall develop and share best practices for

sharing Confirmed Mixed File information among the CRAs, which shall include, but are not limited to, the following actions:

      i.      Upon receipt of notice of a Confirmed Mixed File from another CRA, the receiving CRAs shall:  (a) conduct a reasonable investigation into whether the disputed information is associated with the affected consumer in the CRA's credit database; and (b) take reasonable steps to avoid reporting any indicative information or tradelines deemed inaccurate because they belong to another identified consumer.

      ii.      The CRAs shall analyze their shared data on Confirmed Mixed File information and other data concerning the manner of reporting tradelines and indicative information to determine other appropriate actions, if any, that should be taken to reduce the incidence of Confirmed Mixed Files.

      iii.      The CRAs shall develop guidelines and procedures for communicating with consumers about mixed files and shall create educational content about mixed files generally, as part of the consumer education enhancements in Sections III.B.7.d and III.C.1.

    **4.**    ***Improving Notifications to Consumers on Reinvestigation Results***

      a.      Following the CRA's reinvestigation of a consumer dispute, the CRA shall provide consumers a notice that contains standardized elements regarding the nature of the reinvestigation and post-dispute options for the consumer, which notice shall supplement, and not supplant, any notices the CRAs are currently required by law to provide consumers.  Such standardized elements shall include, but are not limited to, an explanation of:

      i.      the actions taken by the CRA regarding the consumer's dispute,

including, if applicable, contact information for any furnisher involved in responding to the dispute, a description of the role played by the furnisher in the reinvestigation process, and an explanation of the furnisher's certification of compliance that governs the furnisher's investigative obligations;

ii.        the results of the consumer's dispute, including, if applicable, the specific modification or deletion of information that was made to the consumer's file following the reinvestigation; and

iii.        the consumer's options if he or she is dissatisfied with the reinvestigation results, which shall include submitting documents in support of the dispute, adding a consumer statement to his or her credit file, filing a dispute with the relevant furnishers, and submitting a complaint against the CRA and/or the relevant furnishers with the CFPB complaint portal or the consumer's state attorney general.

b.        No less than semi-annually, the CRAs shall evaluate consumer dispute analytics to determine whether additional standardized communications to consumers are warranted that would further benefit consumers and improve their satisfaction with dispute outcomes.

5.    *Additional Free Annual Credit Report to Consumers Following Reinvestigation*

The CRAs shall implement a process by which consumers who initiate a dispute of information contained in their free annual credit report disclosure are granted the ability to request one additional free annual credit report disclosure—as authorized by the FCRA, 15 U.S.C. § 1681j(a)—during the twelve-month period following a change to the consumer's file as requested by the consumer in the dispute.  This additional free annual credit report disclosure

shall be in addition to and shall not diminish any other right of a consumer to request and obtain a free credit report disclosure from any of the CRAs.

**6.    *Enhancing e-OSCAR Furnisher Certifications and Terms of Use***

a.    The CRAs shall review and update the terms of use agreed to by furnishers using e-OSCAR, as well as the ACDV and AUD certifications made by furnishers through e-OSCAR, in order to: (i) emphasize compliance with furnishers' obligations under the FCRA; (ii) reinforce furnishers' obligations to review and consider images of documents submitted by consumers as part of the furnishers' reinvestigations of consumer disputes; and (iii) incorporate recent regulatory guidance from the CFPB advising furnishers of their responsibilities concerning handling and investigating consumer disputes.[14]  At a minimum, the furnisher certifications prior to submitting an ACDV or AUD shall be updated using language substantially similar to the following: "By submitting this ACDV [or AUD, as applicable], you certify that you have reviewed and considered all associated Images, you have verified the accuracy of the data in compliance with all legal requirements, and your computer and/or manual records will be adjusted to reflect any changes noted."

b.    No less than semi-annually, the CRAs shall analyze data on consumer disputes that is available in e-OSCAR to determine whether other actions, if any, should be taken to enhance the e-OSCAR system and furnishers' conduct in processing automated consumer disputes.

---

[14] *See* CFPB Bulletin 2013-09 (Sept. 9, 2013) (discussing a furnisher's obligation to review all relevant information received from a CRA in connection with a consumer dispute); CFPB Bulletin 2014-01 (Feb. 27, 2014) (discussing a furnisher's obligation to investigate disputed information in a consumer credit report and provide notice of inaccurate information to the CRAs).

7.    *Escalated Dispute Handling for Mixed Files, Fraud, and Identity Theft*

a.    The CRAs shall each implement a process to identify and process disputes that qualify for escalated handling.  The processes implemented shall not discourage call center personnel or those handling written disputes from escalating disputes or provide the call center personnel or those handling written disputes with incentives to avoid escalation.

b.    Subject to Section III.B.7.c below, the types of complaints that shall qualify for escalated handling include mixed files, fraud, and identity theft.  Escalated handling shall include the involvement of representatives from specialized groups with substantial experience processing these types of disputes, who will process the consumer's dispute through completion and review any Supporting Dispute Documentation and all relevant information in the consumer's credit file to facilitate a reinvestigation of all items disputed by the consumer. The Working Group shall evaluate consumer dispute analytics to determine whether other types of consumer disputes warrant escalated handling.  In addition, the Working Group shall facilitate the sharing among the CRAs of best practices relating to escalated handling.

c.    Notwithstanding any of the foregoing, the escalated dispute handling procedures detailed in this Section III.B.7 shall apply only with respect to disputes initiated with the CRAs pursuant to direct consumer contacts as provided in the FCRA, 15 U.S.C. § 1681i(a), and the CRAs shall not be required to employ the escalated dispute handling procedures with respect to disputes initiated by credit repair firms or disputes that the CRAs reasonably determine to be frivolous or irrelevant.

d.    The CRAs shall update their respective websites and cooperate in the approval and inclusion of educational material to be posted on AnnualCreditReport.com that

provides information and instruction to consumers who may have disputes regarding their credit reports which qualify for escalated handling.

**8.** ***Review of Supporting Dispute Documentation Submitted by Consumers***

a.     Subject to Section III.B.8.b below, each CRA shall utilize a process designed to assure that during a CRA's reinvestigation of a dispute of any item of information contained in a consumer's file, if a consumer submits Supporting Dispute Documentation and the CRA does not otherwise modify the information in the manner requested by the consumer, the Supporting Dispute Documentation shall be reviewed by an agent of the CRA with discretion to make a determination whether to make the change requested by the consumer on the basis of the Supporting Dispute Documentation.

b.     Notwithstanding any of the foregoing, the Supporting Dispute Documentation review procedures detailed in this Section III.B.8 shall apply only with respect to disputes initiated with the CRAs pursuant to direct consumer contacts as provided in the FCRA, 15 U.S.C. § 1681i(a), and the CRAs shall not be required to employ the Supporting Dispute Documentation review procedures with respect to disputes initiated by credit repair firms or disputes that the CRAs reasonably determine to be frivolous or irrelevant consistent with Section III.B.2.

**C.     AnnualCreditReport.com**

**1.     *Enhancing AnnualCreditReport.com***

a.     Link to Each CRA's Consumer Dispute Website

i.     Subject to regulatory approval under the Credit Card Responsibility Accountability and Disclosure Act of 2009 and accompanying regulation, the

Page 23 of 41

CRAs shall enhance the consumer experience on AnnualCreditReport.com by prominently providing hyperlinks leading directly to each CRA's respective online dispute website and instructions for consumers on how to initiate a dispute at each of those websites regarding information disclosed in consumers' credit reports.

ii.     The CRAs shall ensure that the landing website pages corresponding to the hyperlinks provided to consumers who obtain disclosures on AnnualCreditReport.com are free from any advertising, marketing offers, or other solicitations.

b.     <u>Enhanced Consumer Educational Content</u>

The CRAs shall update their respective websites and cooperate in the approval and inclusion of consistent educational material on AnnualCreditReport.com to improve consumers' understanding of their credit reports, the consumer dispute process and the types of helpful documentation that should be included with the consumer's dispute, and consumers' roles in helping to promote the goal of assuring maximum possible accuracy in consumer credit reporting. In addition, the CRAs shall enhance consumer education, which shall include, but is not limited to, taking the following actions.

i.     The CRAs shall review and enhance consumer educational content related to fraud, identity theft, security freezes, data breaches, submission of Death Notices, consumer disputes of credit report information (including, but not limited to, Disputed Deceased Indicators), and options for consumers who are dissatisfied with the reinvestigation results.

ii.     Representatives from each CRA shall evaluate consumer dispute analytics to determine whether other issues and credit reporting topics are appropriate to develop educational content for inclusion on AnnualCreditReport.com and on the CRAs' respective

websites.

    iii.  The CRAs shall provide links on the CRAs' respective websites that direct consumers to educational material on AnnualCreditReport.com.

    iv.  The CRAs shall cooperate in the approval and inclusion of consistent educational material on AnnualCreditReport.com regarding:  (a) how to file a dispute; (b) the types of Supporting Dispute Documentation most likely to aid the resolution of a consumer's dispute; and (c) how to provide Supporting Dispute Documentation to the CRAs.

    2.  ***Promoting AnnualCreditReport.com***

    a.  Each CRA shall clearly and conspicuously disclose on the landing page of its Desktop Website as defined in Section III.C.2.b below that consumers can obtain a free annual credit report by including a hyperlink that is prominently labeled "Get Your Free Annual Credit Report" or words of similar import.  The hyperlink should be readily visible to a visitor to the landing webpage without the visitor having to scroll down on the webpage and should link directly to AnnualCreditReport.com.  The hyperlink may appear via a drop-down menu if: (i) the tab for the drop-down menu is readily visible to a visitor to the landing webpage without the visitor having to scroll down on the webpage and is labeled "Credit Reports" or words of similar import; and (ii) the "Get Your Free Annual Credit Report" hyperlink appears first in the drop-down menu and links directly to AnnualCreditReport.com.

    b.  The obligations of Section III.C.2.a shall apply only with respect to the CRA's full website, meaning the only public version of the CRA's website that may be accessed by a desktop computer ("Desktop Website").  The CRAs shall not be required to impose the

obligations of Section III.C.2.a with respect to their mobile or tablet websites, apps, or other alternative electronic displays other than their Desktop Websites.

### D.    <u>Educational Campaign</u>

Over the three (3) years following the Effective Date, the CRAs shall conduct a credit reporting-themed educational campaign (the "Campaign") through which they shall create, distribute, and present messages designed to educate consumers on specific topics relating to credit reporting (the "Educational Content") and distribute the Educational Content through unpaid placements of public service announcements ("PSAs"), internet chats and other online content, and paid placements in print, radio and television media as specified further below.

### 1.    *Topics for Educational Content*

a.    The Campaign shall address, at a minimum, the following topics:  (a) the consumers' right to obtain a free annual credit report from each of the CRAs via AnnualCreditReport.com; (b) the consumers' right to dispute inaccurate information in their credit file; and (c) the consumers' right to submit supporting documentation in support of such disputes.  The Campaign shall cover the topics listed above, but there is no requirement for each placement to cover all such topics.

b.    The Campaign placements shall not be commercial or promotional in nature.

### 2.    *Framework of Campaign*

a.    <u>Print Media</u>.  The Campaign shall include the following print component:

i.    During all four quarters of the first year and during the first and

Page 26 of 41

third quarters of the second and third years of the Campaign, the CRAs shall place PSAs in both English and Spanish language newspapers in the State of New York. Although the CRAs cannot guarantee a specific number of placements, the CRAs represent that, in their experience, a distribution service ordinarily would be able to place PSAs in publications that claim a cumulative total circulation of more than one million people.

        ii.      During each quarter of the second year of the Campaign, the CRAs shall purchase quarter-page print advertisements containing the Educational Content. The quarterly placements need not be in all the publications listed in Exhibit B, but the CRAs shall ensure that the Educational Content runs at least two (2) times during the second year of the Campaign in each such publication. Should any publication listed in Exhibit B no longer exist, the CRAs shall replace it with a comparable publication, to the extent reasonably practicable.

        b.      <u>Radio</u>. The Campaign shall include the following radio component:

        i.      During each of the second and fourth quarters of the second year of the Campaign, the CRAs shall run the Educational Content in purchased radio spots for a period of no fewer than ten (10) weeks on at least ten (10) radio stations in the State of New York, including at least two (2) Spanish language stations.

        ii.      Although the CRAs cannot guarantee a specific number of spots, the CRAs shall make good faith efforts to place radio spots that are reasonably believed to reach a significant geographic area of the State of New York and a significant audience. The CRAs shall not be in breach of this provision, provided they run no fewer than five (5) spots per week for the ten (10) week period during each of the second and fourth quarters of the second year of the Campaign on at least ten (10) radio stations in the State of New York, including at least two

(2) Spanish language stations.

      c.    <u>Television</u>. The Campaign shall include the following television component:

      i.    During each quarter of the third year of the Campaign, the CRAs shall run the Educational Content in purchased television spots for no fewer than ten (10) weeks on at least two (2) English and two (2) Spanish language stations in the State of New York. In addition, the CRAs shall solicit their industry association, the CDIA, to attempt to place PSAs on at least two (2) English and two (2) Spanish language television stations in the State of New York during the third and fourth quarters of the third year of the Campaign.

      ii.    Although the CRAs cannot guarantee a specific number of paid television spots, the CRAs shall make good faith efforts to place spots at such times of day and with such television stations that are reasonably believed to reach a significant geographic area of the State of New York and a significant audience. The CRAs shall not be in breach of this provision, provided they run no fewer than ten (10) paid spots per week for a ten (10) week period during each quarter of the third year of the Campaign on at least two (2) English and two (2) Spanish language stations in the State of New York.

      d.    <u>Internet</u>. The Campaign shall include the following internet component:

      i.    Twice a year during the first, second, and third years of the Campaign, the CRAs shall jointly host a one-hour online chat designed to interact with and educate consumers on the topics in Section III.D.1.a.

      ii.    The online chats shall be promoted in the State of New York, including promotion through Twitter and on the CRAs' websites.

**3.** *NYAG Involvement*

The CRAs shall submit the Educational Content to the NYAG prior to publication or broadcasting. The NYAG shall promptly inform the CRAs of any concerns regarding the Educational Content.

**4.** *Campaign Costs*

All costs related to the Campaign shall be borne by the CRAs.

**E.** **Furnisher Monitoring**

**1.** *Working Group*

To enhance their respective capabilities for monitoring individual furnishers, the CRAs shall develop the National Credit Reporting Working Group ("Working Group"), which shall: (i) catalogue and share best practices for monitoring furnishers on an individual-furnisher level and on a category-wide and/or industry-wide level; (ii) identify and establish data quality metrics for monitoring individual furnishers, categories of furnishers, and/or industries of furnishers; and (iii) share and compare information and reports among the CRAs to identify further actionable data quality and accuracy initiatives.

**2.** *Composition of the Working Group*

The Working Group shall be comprised of internal data experts from each CRA who are knowledgeable about their respective systems, policies, and procedures relating to furnishers and data acquisition. As appropriate, individuals from each CRA with expertise in the consumer dispute process, data quality, matching logic, and other facets of the CRAs' operations will participate in Working Group meetings. Counsel for a CRA may also participate in Working Group meetings.

3.    *Frequency of Working Group Meetings*

The Working Group shall conduct its first meeting during the first calendar quarter following the Effective Date and shall continue to meet quarterly for a period of three (3) calendar years after the Effective Date.  Working Group meetings shall be conducted in person or via teleconference or video conference, but at least one meeting per year shall take place in person.

4.    *Functions of the Working Group*

a.    Coordinate and Review Furnisher Analytics and Metrics

The Working Group shall coordinate the development and review of reports and metrics that analyze key data related to furnishers, including but not limited to:  on an industry basis (*e.g.,* collections, student loans); on a time-series basis by industry (*i.e.*, a trending analysis that examines data over an extended time period); and/or in the form of benchmarking reports.  These reports and metrics may include, but are not limited to, the following topics and purposes:

i.    Individual-furnisher, category-wide, and industry-wide metrics related to:  (a) the overall number of consumer disputes and/or ratio of consumer disputes to items reported; (b) furnishers who fail to respond to disputes; and (c) furnishers' compliance with their statutory obligations;

ii.    Reports developed and trends identified through analysis of data furnished to the CRAs, including analyses of credit account data regularly furnished to each CRA (*i.e.*, tradelines), and reports and metrics that focus on rates of consumer complaints, furnisher disputes and responses, and dispute outcomes;

iii.    Reports and metrics focused on furnisher reporting by industry,

including analyses of the frequency and timeliness of reporting, reports that evidence the proper use of Metro 2 codes, reports on data rejection rates and reasons for rejecting data submitted by a furnisher, and reports on other similar statistical data;

        iv.        Benchmarking reports based on factors such as industry, portfolio type, and/or portfolio size, in order to compare the data and trends identified in the reports described above to further review the quality of the data furnished to the CRAs; and

        v.        Proposed changes to the CRAs' existing policies and procedures related to data accuracy and furnisher monitoring based on any areas of concern and/or best practices identified by the Working Group pursuant to Section III.E.4.b.

        b.        <u>Identify Data Accuracy Best Practices</u>

The Working Group shall discuss each CRA's policies and procedures pertaining to data accuracy and furnishers in order to identify potential best practices. The Working Group's discussions may include, but not be limited to, topics addressed in Sections III.A and B above, including: minimum identification elements on newly opened trade and collection data; uniform standards regarding the collection of public record data; additional types of consumer disputes that warrant escalated handling; furnisher credentialing and onboarding; data intake procedures; data hygiene tools and procedures; furnisher monitoring techniques; reports and trending analysis tools; policies designed to address fraud and data accuracy risk; and other policies and procedures designed to enhance data quality. The Working Group shall identify potential best practices and policies designed to lead to more effective furnisher monitoring and/or enhanced data quality and accuracy.

5.     *Corrective Action Against Certain Furnishers*

a.     Each CRA shall implement policies to monitor the performance of individual furnishers and categories of furnishers based on the recommendations of the Working Group and/or the CRA's own initiative.

b.     Utilizing the metrics established by the Working Group and/or the CRA, each CRA shall take corrective action, when reasonably necessary, with respect to a furnisher that fails to comply with its obligations regarding data furnishing and reinvestigating consumer disputes.   Reasonably necessary corrective action may include working with a furnisher to remediate the root cause of the problem when the furnisher initially fails to meet certain benchmarks established by the Working Group, suppressing certain of the furnisher's data during the remediation process, issuing warnings to furnishers who continue to fail to meet certain benchmarks despite being retrained by the CRAs with respect to the identified problem, and refusing to accept certain information from furnishers that repeatedly fail to remediate identified problems or that demonstrate a disregard for their statutory and contractual obligations based on the Working Group's or CRA's metrics.

IV.     <u>**CONSUMER COMPLAINTS**</u>

To ensure that consumer complaints brought to the attention of the NYAG are handled promptly, the parties agree on the following protocol.  Each CRA shall designate a department or group within their respective companies to assist the NYAG in addressing consumer complaints. Each CRA shall provide the NYAG with direct contact information for the designated department or group, including at least one designated management-level employee's telephone

number and e-mail address for direct communications regarding matters that cannot be resolved by the designated department. The CRA's designated department or group shall then ensure that the CRA responds promptly to complaints and shall remain a point of contact for the NYAG for any subsequent inquiries related to specific complaints.

## V. <u>COMPLIANCE</u>

1. Beginning six (6) months from the Effective Date and continuing until six (6) months after the Completion Date, each CRA shall provide the NYAG with semi-annual affidavits of compliance ("Affidavits").

2. The Affidavits shall include the following:

a. A report detailing whether each provision of the Agreement that was scheduled to have been implemented by the date of the Affidavit's submission pursuant to the Implementation Schedule was timely implemented, and if not, the reason that the provision was not timely implemented;

b. The total number of disputes filed by consumers that resulted in any of the following outcomes, broken down by total number in each category, for the six-month period prior to submission of the Affidavit: (i) no response; (ii) verified as reported; (iii) delete; (iv) delete due to fraud; or (v) modify;

c. If applicable, a description of the implementation of any new policies or practices or modifications to policies or practices recommended by the Working Group during the six (6) months preceding submission of the Affidavit;

d. If applicable, a description of the results of any new policies or practices or the results of any modifications to policies or practices implemented as a result of the

Working Group's recommendations (*e.g.*, evidence of a decrease in the number of disputes or in the number of repeat disputes for particular furnishers or categories of furnishers);

   e. A description of any material corrective measures used to address furnisher failure to adequately comply with obligations regarding data accuracy or consumer disputes during the six (6) months preceding submission of the Affidavit, which description shall set forth:

     i. The overall number of furnishers for which a CRA took material corrective action;

     ii. The industry groups for the furnishers and number of furnishers within such industry group; and

     iii. A general description of the types of material corrective action taken by the CRA; and

   f. Details concerning the Working Group, including:

     i. A current list of Working Group members;

     ii. Dates of Working Group meetings occurring during the prior six months; and

     iii. A description of any recommendations made or best practices issued by the Working Group during the prior six months.

## MISCELLANEOUS

   1. The NYAG has agreed to the terms of this Agreement based on, among other things, the representations made to the NYAG by the CRAs and their counsel. To the extent that any material representations are later found to be inaccurate or misleading, this Agreement is

voidable by the NYAG in its sole discretion.

2.      If the Agreement is voided, the CRAs agree that any statute of limitations or other time-related defenses applicable to the subject of the Agreement and any claims arising from or relating thereto are tolled from and after the date of this Agreement.  In the event the Agreement is voided, the CRAs expressly agree and acknowledge that this Agreement shall in no way bar or otherwise preclude the NYAG from commencing, conducting or prosecuting any investigation, action or proceeding, however denominated, related to the Agreement, against the CRAs, or from using in any way any statements, documents or other materials produced or provided by the CRAs prior to or after the date of this Agreement.

3.      No representation, inducement, promise, understanding, condition, or warranty not set forth in this Agreement has been made to or relied upon by the CRAs in agreeing to this Agreement.

4.      The CRAs represent and warrant, through the signatures below, that the terms and conditions of this Agreement are duly approved, and execution of this Agreement is duly authorized.  The CRAs shall not take any action or make any statement denying, directly or indirectly, the propriety of this Agreement or expressing the view that this Agreement is without factual basis.  Nothing in this paragraph affects the CRAs' (i) testimonial obligations or (ii) right to take legal or factual positions in defense of litigation or other legal proceedings to which the NYAG is not a party.  This Agreement is not intended for use by any third party in any other civil or administrative proceeding, court, arbitration, or other tribunal, and is not intended, and should not be construed, as any concession, as evidence of or an admission of wrongdoing or

liability by the CRAs.  Nothing in this Agreement is intended to create any private rights, cause of action, third party rights, or remedies for any individual or entity against any of the CRAs or their subsidiaries.

5.      This Agreement and/or the Implementation Schedule may not be modified except with the consent of the NYAG, which consent shall not be unreasonably withheld.  A CRA shall obtain the consent of the NYAG if the CRA, in good faith, needs to make any material modifications or other material changes to the scheduled dates established in the Implementation Schedule, which consent shall not be unreasonably withheld.  In addition, a CRA shall obtain the consent of the NYAG if the CRA, in good faith, determines that any material modifications or other material changes to the Supporting Dispute Documentation review procedures listed in Section III.B.8 should be made due to future technological or other innovations that would reasonably provide consumers with a better experience or more consistent review of their Supporting Dispute Documentation, which consent shall not be unreasonably withheld.

6.      This Agreement may not be amended except by an instrument in writing signed on behalf of all the parties to this Agreement.  However, to the extent a CRA requires to amend this Agreement in a manner that would not affect any other CRA's rights or obligations hereunder, and the NYAG consents to such amendment, this Agreement may be so amended by an instrument in writing signed on behalf of the NYAG and the affected CRA only, which amendment shall apply only to the signatories thereto.

7.      This Agreement shall be binding on and inure to the benefit of the parties to this Agreement and their respective successors and assigns, provided that no party, other than the

Page 36 of 41

NYAG, may assign, delegate, or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the NYAG.

8.     It is understood and agreed that this Agreement shall apply to the CRAs, whether acting through their respective directors, officers, employees, representatives, agents, assigns, successors, affiliates, subsidiaries or other business person or business entities whose acts, practices, or policies are directed, formulated, or controlled by the CRAs.

9.     In the event that any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement.

10.     To the extent not already provided under this Agreement, the CRAs shall, upon request by the NYAG, provide all documentation and information necessary for the NYAG to verify compliance with this Agreement.

11.     All notices, reports, requests, and other communications to any party pursuant to this Agreement shall be in writing and shall be directed as follows:

**If to Experian to:**

Darryl Gibson, Esq.
Group General Counsel
Experian Information Solutions, Inc.
475 Anton Blvd.
Costa Mesa, CA 92626

**If to Equifax to:**

John J. Kelley, III, Esq.
Chief Legal Officer
Equifax Information Services LLC
1550 Peachtree Street, N.W.
Atlanta, GA 30309

Page 37 of 41

**If to TransUnion to:**

John Blenke, Esq.
EVP and General Counsel
TransUnion LLC
555 W. Adams Street
Chicago, IL 60661

**If to the NYAG to:**

Carolyn Fast, Special Counsel
Melissa O'Neill, Assistant Attorney General
Office of the New York State Attorney General
Bureau of Consumer Frauds and Protection
120 Broadway, 3rd Floor
New York, NY 10271

12.     Acceptance of this Agreement by the NYAG shall not be deemed approval by the NYAG of any of the practices or procedures referenced herein, and the CRAs shall make no representation to the contrary.

13.     In the event that the NYAG determines that any of the CRAs has violated this Agreement, the NYAG shall have the right to enforce the Agreement against that CRA in any court of competent jurisdiction in New York State.

14.     If a court of competent jurisdiction determines that any of the CRAs have breached this Agreement, that CRA shall pay to the NYAG the cost, if any, of such determination and of enforcing this Agreement, including without limitation legal fees, expenses, and court costs.

15.     In the event that any of the CRAs enter into an agreement with a federal or state agency, including but not limited to any state Attorney General's Office, within 24 months of the Effective Date, and such agreement includes injunctive relief that provides benefits or

Page 38 of 41

protections to consumers that are not included in this Agreement, such additional benefits or protections shall be extended by the CRA(s) to New York consumers.

16.     The NYAG finds the relief and agreements contained in this Agreement appropriate and in the public interest.  The NYAG is willing to accept this Agreement in lieu of commencing a statutory proceeding.  This Agreement shall be governed by the laws of the State of New York without regard to any conflict of laws principles.

17.     Nothing contained herein shall be construed as to deprive any person of any private right under the law.

18.     Notwithstanding anything in this Agreement, if compliance with any provision of this Agreement would render compliance with any existing or future provision of New York or federal laws or regulations relating to the same subject matter impossible, then compliance with such provision of state or federal law or regulation shall be deemed compliance with the relevant provision of this Agreement.  The CRAs shall provide written notice to the NYAG within fifteen (15) days of its determination that compliance with a provision of this Agreement is rendered impossible by state or federal law or regulation.

19.     This Agreement constitutes the entire agreement between the NYAG and the CRAs and supersedes any prior communication, understanding or agreement, whether written or oral, concerning the subject matter of this Agreement.

20.     This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

Page 39 of 41

IN WITNESS WHEREOF, this Agreement is executed by the parties hereto on March 8, 2015.


ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By:   /s/ Jane M. Azia
JANE M. AZIA
Bureau Chief
Bureau of Consumer Frauds and Protection


By:   Carolyn Fast
CAROLYN FAST
Special Counsel


By:   Melissa O'Neill
MELISSA O'NEILL
Assistant Attorney General




EXPERIAN INFORMATION SOLUTIONS, INC.


By:   _____
DANIEL J. MCLOON
Jones Day
Counsel for Experian


By:   _____
DARRYL GIBSON
Group General Counsel



Page 40 of 41

IN WITNESS WHEREOF, this Agreement is executed by the parties hereto on March __, 2015.


ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By: _____

JANE M. AZIA
Bureau Chief
Bureau of Consumer Frauds and Protection


By: _____

CAROLYN FAST
Special Counsel


By: _____

MELISSA O'NEILL
Assistant Attorney General




EXPERIAN INFORMATION SOLUTIONS, INC.

By: _____

DANIEL J. MCLOON
Jones Day
Counsel for Experian


By: _____

DARRYL GIBSON
Group General Counsel



Page 40 of 41

EQUIFAX INFORMATION SERVICES, LLC

By: _____

SIRAN S. FAULDERS
Troutman Sanders LLP
Counsel for Equifax

By: _____

JOHN J. KELLEY III
Chief Legal Officer

TRANSUNION LLC

By: _____

CLAUDE G. SZYFER
Stroock & Stroock & Lavan LLP
Counsel for TransUnion

By: _____

JOHN BLENKE
EVP and General Counsel

Page 41 of 41

EQUIFAX INFORMATION SERVICES, LLC

By: _____

      SIRAN S. FAULDERS
      Troutman Sanders LLP
      Counsel for Equifax

By: _____

      JOHN J. KELLEY III
      Chief Legal Officer

TRANSUNION LLC

By: _____

      CLAUDE G. SZYFER
      Stroock & Stroock & Lavan LLP
      Counsel for TransUnion

By: _____

      JOHN BLENKE
      EVP and General Counsel

## EXHIBIT A

## IMPLEMENTATION SCHEDULE

The provisions of the Agreement in Section III shall be implemented in the following Phases, per Section II of the Agreement.  The descriptions set forth here are summaries of the various initiatives to be implemented by the CRAs.  Please refer to the Agreement for the full terms and scope of each initiative summarized here.

### Phase 1 Initiatives

- Section III.A.2 (announce retirement of Metro 1 data reporting format).

- Section III.A.4.b (inform furnishers of date of birth reporting requirement for newly opened accounts).

- Section III.B.1.a–b (eliminate conditions for accepting disputes).

- Section III.B.4.b (evaluate consumer dispute analytics).

- Section III.B.6.b (analyze data on consumer disputes available through e-OSCAR).

- Section III.B.7.a (implement procedures to identify and process disputes for escalated handling).

- Section III.B.8.a (Supporting Dispute Documentation review by CRAs).

- Section III.C.2 (Promoting AnnualCreditReport.com on CRAs' landing webpages)

- Section III.D (develop and begin rollout of the PSA Campaign).

- Section III.E.1–3 (National Credit Reporting Working Group on furnisher monitoring).

### Phase 2 Initiatives

- Section III.A.1.a–d (various Collection Furnisher initiatives).

- Section III.A.3.b. (instruct Collection Furnishers on the use of the Metro 2 comment codes for "paid by insurance" and "being paid by insurance").

- Section III.A.5.a (Illegal Lender identification initiative).

- Section III.B.3.a (various initiatives relating to the sharing of, obligations upon receipt of, and reporting of Disputed Deceased Indicators).

1

- Section III.B.3.b (various initiatives relating to the sharing of, obligations upon receipt of, and education to consumers regarding Death Notices and other information relating to deceased consumers).

- Section III.B.3.c.iii (develop guidelines and procedures for communicating with consumers about mixed files and create educational content about mixed files generally).

- Section III.B.5 (provide consumer right to request one additional free annual credit report disclosure during the twelve-month period following a change to the consumer's file).

- Section III.B.6.a (update terms of use agreed to by furnishers using e-OSCAR, as well as the ACDV and AUD certifications made by furnishers through e-OSCAR).

- Section III.B.7.d (update CRAs' websites and AnnualCreditReport.com with educational material regarding disputes that qualify for escalated handling).

- Section III.C.1.a (initiatives relating to enhancing the consumer experience on AnnualCreditReport.com).

- Section III.C.1.b (various initiatives relating to enhancing CRAs' websites and AnnualCreditReport.com with educational material for consumers regarding the dispute process).

- Section III.E.4.b (Working Group review of CRAs' policies and procedures pertaining to data accuracy and furnishers in order to identify potential best practices).

**Phase 3 Initiatives**

- Section III.A.1.e (additional Collection Furnisher initiatives).

- Section III.A.2 (migrate to Metro 2 data reporting format for all furnishers; no longer accept Metro 1 data reporting format).

- Section III.A.3.a, 3.c (medical debt collection initiatives relating to preventing the reporting of and potential suppression of certain medical debt data).

- Section III.A.4.a (prohibit furnishers from reporting authorized users without a date of birth for new accounts).

- Section III.A.5.b (additional Illegal Lender initiative).

- Section III.A.6–7 (establish new standards regarding indicative information and public records).

- Section III.B.2 (initiative relating to Repeat Disputes).

2

- Section III.B.3.c–c.ii (various initiatives relating to mixed files).

- Section III.B.4.a (provide standardized notices following reinvestigation of dispute).

- Section III.E.4.a (develop and review reports and metrics analyzing key furnisher data).

- Section III.E.5.a–b (implement policies relating to furnisher monitoring).

3

**EXHIBIT B**

**LIST OF PUBLICATIONS**

| Publication Name | Location |
|---|---|
| El Diario La Prensa | NYC |
| New York Post | NYC |
| New York Daily News | NYC |
| Newsday | NYC |
| amNewYork | NYC |
| Journal News | White Plains |
| Times Herald-Record | Middletown |
| Poughkeepsie Journal | Poughkeepsie |
| The Buffalo News | Buffalo |
| Albany Times Union | Albany |
| The Daily Gazette | Schenectady |
| Democrat and Chronicle | Rochester |
| Post-Standard | Syracuse |
| The Ithaca Journal | Ithaca |
| Press & Sun Bulletin | Binghamton |
| Observer Dispatch | Utica |
| Watertown Daily Times | Watertown |
| Star-Gazette | Elmira |
| The Leader | Corning |

FILED
09-16-2020
John Barrett
Clerk of Circuit Court
2020CV005484
Honorable Christopher R.
Foley-14
Branch 14

# Exhibit C



State Collection Service, Inc. ◆ 2509 S. Stoughton Rd. ◆ Madison, WI 53716
A Private Collection Agency

Phone Number (608) 661-8133 or Toll Free (855) 783-4361
Hours: Mon. – Thurs. 7a – 9p ◆ Fri. 7a – 5p ◆ Sat. 8a – 12p

September 23, 2019

Account #: ▆▆▆0566

***** REMINDER *****

Your payment of $ 169.00 is due 09/30/19.

**You may sign up for email notifications.**

If you would like to receive notices by email, please visit: http://www.statecollectionservice.com/emailme.  When you sign up  for email notifications, please use the account number above.

To assure proper credit please write this number ▆▆▆0566 on your check or money order.

The account number above is an account number we assigned to an account in our office.  You may have more than one account in our office that is the subject of your payment arrangement.  There may be other accounts in another department in our office.

When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction.

| Creditors: | Amount Owed: |
|---|---|
| PROHEALTH MEDICAL GROUP | $  5.71 |
| WAUKESHA BEHAVIORAL MEDICINE CENTER | $ 151.73 |
| WAUKESHA MEMORIAL HOSPITAL INC | $ 517.50 |
| Total Amount Due: | $ 674.94 |

If you would like to make a payment, we provide the following options:

  Text 'PAY' to 474747 for mobile pay

  Pay online at **www.statecollectionservice.com/paymybill**

  To make an automated telephone payment, call (608) 441-5010 or toll free (877) 677-4862

▆  Cash, Check, Credit Card, Debit Card or Money Order

This communication is from a debt collector.  This is an attempt to collect a debt.  Any information obtained will be used for that purpose.

***Detach Lower Portion and Return with Payment***

127ONSTAT107555_386850397

PO Box 1280
Oaks PA 19456-1280
ADDRESS SERVICE REQUESTED

| IF PAYING BY CREDIT CARD, FILL OUT BELOW | | |
|---|---|---|
| CIRCLE CARD USING FOR PAYMENT | | |
| Card Number + 3 or 4-digit security code (on back of card) | | AMOUNT |
| SIGNATURE | | EXP. DATE |

September 23, 2019

S1
Danielle M Stima
1110 S 48th St Lowr
West Allis WI 53214-3510

State Collection Service, Inc.
PO Box 6250
Madison WI 53716-0250

Phone Number (608) 661-8133 or Toll Free (855) 783-4361

Account # ▆▆▆0566
Amount: $ 674.94

494 4

FILED
09-16-2020
John Barrett
Clerk of Circuit Court
2020CV005484
Honorable Christopher R.
Foley-14
Branch 14

# Exhibit D

**state**
collection service, inc.

State Collection Service, Inc. ♦ 2509 S. Stoughton Rd. ♦ Madison, WI 53716
A Private Collection Agency

Phone Number (608) 661-3063 or Toll Free (800) 207-8153
Hours: Mon. – Thurs. 7a – 9p ♦ Fri. 7a – 5p ♦ Sat. 8a –12p

October 13, 2019

The past due accounts below have been referred to this office for debt collection. You may pay the total amount due by cash, check, credit card, debit card or money order. If requested, this office will notify you if and when it intends to report this claim to a credit bureau, but in no event will that happen until after the 30 day validation period described below.

| Creditor | Client Acct # | Service Date | Account Balance |
|---|---|---|---|
| AURORA MED CTR OF WASHINGTON CTY INC | 5467 | 05/26/19 | $90.00 |
| | | Total Amount Due: | $ 90.00 |

**\*\*IMPORTANT CONSUMER NOTICE\*\***

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will: Obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction.

If you would like to make a payment, we provide the following options:

    Text "PAY" to 474747 for mobile pay

    Pay online at **www.statecollectionservice.com/paymybill**

    To make an automated telephone payment, call (608) 441-5010 or toll free (877) 677-4862

    Cash, Check, Credit Card, Debit Card or Money Order

This communication is from a debt collector. This is an attempt to collect a debt. Any information obtained will be used for that purpose.

**This collection agency is licensed by the Division of Banking in the Wisconsin Department of Financial Institutions, www.wdfi.org.**

***Detach Lower Portion and Return with Payment***

127ON6TAT106429_381851503

PO Box 1280
Oaks PA 19456-1280
ADDRESS SERVICE REQUESTED

| IF PAYING BY CREDIT CARD, FILL OUT BELOW | | |
|---|---|---|
| CIRCLE CARD USING FOR PAYMENT | | |
| Card Number + 3 or 4-digit security code (on back of card) | | AMOUNT |
| SIGNATURE | | EXP. DATE |

October 13, 2019

S1
Jane Ranft
N4976 County Road Ws
Iron Ridge WI 53035-9689

State Collection Service, Inc.
PO Box 6250
Madison WI 53716-0250

Phone Number (608) 661-3063 or Toll Free (800) 207-8153

Account # 8067
Total Due: $ 90.00

FILED
09-16-2020
John Barrett
Clerk of Circuit Court
2020CV005484
Honorable Christopher R. Foley-14
Branch 14

# Exhibit E

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**PAMELA SLOGASKI and**
**DEBORAH LEMKE,**
                    **Plaintiffs,**

          **v.**                                    **Case No. 18-C-1604**

**AMCOL SYSTEMS, INC.,**
                    **Defendant.**

---

## ORDER

This is a putative class action. The plaintiffs allege that defendant Amcol, a debt collection agency, violated the Fair Debt Collection Practices Act (FDCPA) and the Wisconsin Consumer Act (WCA) by including a misleading statement in letters it sent them seeking to collect medical debt. Amcol has moved to dismiss their amended complaint.

### I.    THE COMPLAINT'S ALLEGATIONS

Under the FDCPA, a consumer has 30 days after receipt of written notice from a debt collector in which to dispute the validity of the debt. 15 U.S.C. § 1692g(a). The written notice must inform the consumer of the 30-day validation period. *Id.* If the consumer does not dispute the debt within the validation period, the debt collector assumes the debt is valid and proceeds with its collection efforts. *Id.*

According to the amended complaint, in 2015, the three major national Credit Reporting Agencies[1], or CRAs, entered into a settlement agreement with the Attorney

---

[1] TransUnion, Equifax, and Experian

1

General of New York in which the CRAs agreed to prevent the reporting and display of medical debt when the date of the first delinquency is less than 180 days prior to the date the account is reported to the CRAs. The purpose of this waiting period is to allow consumers time to resolve the disputes with insurers and delays in payment that frequently arise in the context of medical billing. The CRAs subsequently entered into a parallel agreement with the attorneys general of 31 states. The 180-day waiting period went into effect in September 2017.

In 2018, Amcol mailed form debt collection letters to each of the named plaintiffs regarding alleged medical debt. Plaintiffs attached copies of the letters to the complaint. The letter addressed to plaintiff Slogaski was dated January 23, 2018 and identified a debt of $351.23 for medical services performed on September 8, 2018. Plaintiffs allege that the date of first delinquency for the debt referenced in the Slogaski letter was October 20, 2017. The letter addressed to plaintiff Lemke was dated May 30, 2018 and identified a debt of $3,026.96 for medical services performed on January 12, 2018. Plaintiffs allege that the date of first delinquency for the debt referenced in the Lemke letter was February 18, 2018.

Each plaintiff's letter contained the following language:

> Your account(s) have been placed with this agency by [the medical service provider]. Payment in full is due. **Account(s) over $50.00 not paid in full, may be reported as a bad debt collection item(s) on your credit bureau record after the time period described below. However, in no event will it be reported until after the expiration of the time period described below.** If you need help with this bill, it is important that you contact our office where a representative may assist you.
>
> Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion

2

> thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, **this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after receiving this notice this office will provide you with the name and address of the original creditor if different from the current creditor.**

(Emphasis supplied). Plaintiffs allege that the bolded sentences are misleading because they suggest that the medical debts might appear on the plaintiffs' credit reports at the end of the 30-day FDCPA validation period described in the letter's second paragraph, when in fact Amcol knew that, pursuant to the CRAs' agreements with the state attorneys general, the medical debt was not eligible to be reported until 180 days from the date of first delinquency. In plaintiff Slogaski's case, the FDCPA validation period ended February 22, 2018, but the 180 day waiting period for CRA reporting ended April 18, 2018. In plaintiff Lemke's case, the FDCPA validation period ended June 29, 2018, but the 180 day waiting period for CRA reporting ended August 17, 2018. Plaintiffs allege that the effect of the disputed sentences is to expedite debt payments under false pretenses, because consumers unaware that medical debt reporting is subject to the 180 day waiting period will hasten to pay so that the debt does not appear as a negative item in their credit records.

## II.  LEGAL STANDARDS

### a.  Motion to Dismiss

To avoid dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court

3

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must, at a minimum, "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. In construing a plaintiff's complaint, I assume that all factual allegations are true but disregard statements that are conclusory. *Iqbal*, 556 U.S. 678.

### b. FDCPA and WCA

Recently, in *Dunbar v. Kohn Law Firm, S.C.*, 896 F.3d 762 (2018) the Seventh Circuit provided the following summation of the case law interpreting the FDCPA's prohibition of misleading statements by debt collectors:

> The FDCPA makes it unlawful for a debt collector to use "any false, deceptive, or misleading representation or means in connection with the collection of [a] debt. § 1692e. An objective "unsophisticated consumer" standard applies to § 1692e claims: We ask whether a person of modest education and limited commercial savvy would be likely to be deceived by the debt collector's representation. The objective test disregards bizarre or idiosyncratic interpretations of collection letters. A collection letter can be literally true and still misleading—for example, if it leaves the door open for a false impression.

> Because this is a fact laden inquiry, dismissal on the pleadings is proper only in cases that plainly, on their face, are not misleading or deceptive.

*Id.* at 764-765 (internal citations omitted). Claims under the WCA are analyzed using the same methods, including the "unsophisticated consumer" standard, as the FDCPA. *Brunton v. Nuvell Credit Corp.*, 785 N.W.2d 302, 314-15 (2010).

### III.    ANALYSIS

Amcol's primary argument for dismissal is that the challenged sentences are plainly not misleading. Amcol argues that the sentences only indicate that the Amcol

might report the debt to the CRAs after the validation period. Presumably, if the debt reported to the CRA is medical debt, it would then be the CRA's responsibility to carry out their agreement with the AG's by waiting until the expiration of the 180 day waiting period before publishing the debt information as part of the consumer's credit report.

But the language of the letters is not so clear. The disputed sentences read that a debt not paid in full "may be reported as a bad debt collection item on your credit bureau record." That language *could* be interpreted as describing Amcol reporting the debt to the CRA, but it could also very reasonably be interpreted as describing the CRA's inclusion if the debt in the consumer's credit report, thus lowering the consumer's credit score. I think the "unsophisticated consumer" described by the Seventh Circuit is almost certainly more likely to reach the latter interpretation than the former. The unsophisticated consumer is unlikely to have a nuanced understanding of how information is passed from creditor to debt collector to CRA, but is quite likely to have substantial experience with CRA-reported consumer credit scores and to regard them as consequential to the consumer's financial well-being. Thus I agree with plaintiffs that its not clear on the face of the letter that the challenged sentences describe the debt collector reporting the debt to the CRA, as opposed to the CRA reporting the debt as a factor in its published assessment of the consumers creditworthiness.

This distinction might not make a difference in cases not involving medical debt, since a debt collector's report of a valid debt to a CRA will likely lead directly to the CRA's inclusion of the debt in the consumer's credit report. But given the complaint's allegations about the 180-day waiting period for medical debt, I find plaintiffs have plausibly alleged that the subject letter contains a materially misleading statement about the amount of time

5

they had to pay or otherwise resolve the medical debt before it affected their CRA-reported creditworthiness.

Amcol further argues that the complaint should be dismissed because Amcol is not contractually bound by the agreements between the CRAs and the attorneys general. It also asks me to consider evidence that it did not, in fact, report either plaintiff's debt to the CRA until after the 180-day period had expired. These arguments are irrelevant. Plaintiffs' claims are based on Amcol's alleged violation of plaintiffs' statutory rights to non-misleading information about their debts. *See, e.g., Saenz v. Buckeye Check Cashing of Illinois*, 2016 WL 5080747 (N.D. Ill., Sept. 29, 2016). Amcol didn't need to be a party to the contract to know that it could materially affect the information included in Amcol's letter about the time frame for CRA debt reporting. And that a misleading statement did not come true has no bearing on whether it was misleading at the time a consumer received it.

## IV.     CONCLUSION

For the reasons above**, IT IS ORDERED** that defendant's motion to dismiss the amended complaint (ECF # 13) is **DENIED**.

**IT IS FURTHER ORDERED** that defendant's motion to dismiss the original complaint (ECF # 8) is **DENIED AS MOOT**.

Dated at Milwaukee, Wisconsin, this 12th day of July, 2019.


s/Lynn Adelman
LYNN ADELMAN
District Judge

6

STATE OF WISCONSIN    **CIRCUIT COURT**    MILWAUKEE COUNTY
    **CIVIL DIVISION**

---

JOEL ROESSGER,
1344 S. 120th St.
West Allis, WI 53214,

    and

DANIELLE STIMA
1118 S. 48th St. Lower
West Allis, WI 53214

    and

JANET RANFT
N 4976 County Road Ws
Iron Ridge, WI 53035

    Plaintiffs,


        vs.

STATE COLLECTION SERVICE INC.
2509 S STOUGHTON RD
MADISON, WI 53716-3314,

    and

BCG EQUITIES, LLC
225 South Executive Drive, Suite 201,
Brookfield, WI 53005,

    Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No.: 2020cv005484


Hon. Christopher Foley
Branch 14

---

## ACCEPTANCE OF SERVICE

---

Michael P. McCormick, hereby accepts and admits personal service of the Summons and

Class Action Complaint filed on September 16, 2020, in the above-captioned matter on behalf of

Defendant State Collection Service, Inc.

Mr. McCormick represents that he is authorized to accept and admit service on behalf of the Defendant and hereby waives any and all objections that service of process was improper. The Defendant expressly preserves, and does not waive, any and all other rights, objections, and defenses that they may have to the complaint including but not limited to the court's jurisdiction, and the venue of the action.

The Defendant understands that it must file an answer or motion in response to the complaint within 45 days of October 26, 2020 and is at risk of a default judgment if no responsive pleading is timely filed.

Dated this 26th day of October, 2020.

**STATE COLLECTION SERVICE, INC.**

By:

Michael P. McCormick
2509 S. Stoughton Rd.
Madison, WI 53716
michaelm@stcol.com
Phone No. 608-217-0896

2